**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Clinton STRACHE, Defendant–
Appellant.**

**No. 99–2516.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 30, 1999.

Decided Jan. 27, 2000.

Timothy M. O'Shea (argued), Peggy A. Lautenschlager, Office of the United States Attorney, Madison, WI, for Plaintiff–Appellee.

Susan C. Blesener (argued), Gerald W. Mowris, Pellino, Rosen, Mowris & Kirkhuff, Madison, WI, for Defendant–Appellant.

Before MANION, KANNE and ROVNER, Circuit Judges.

KANNE, Circuit Judge.

Clinton Strache appeals two district court decisions: denial of his motion to suppress evidence seized in a search to which Strache claims that he did not consent, and a two-level enhancement under U.S.S.G. § 2K2.1(b)(1)(B) of his sentence for possession of unregistered firearms. We find that the district court did not commit clear error in finding that Strache consented to the search or in finding that Strache possessed seven "destructive devices" within the meaning of U.S.S.G. § 2K2.1(b)(1)(B) to justify enhancement of his sentence. We affirm both district court findings.

## I. HISTORY

Defendant Clinton Strache was a self-proclaimed "survivalist" with an abiding fondness for explosives and apocalyptic fears about the imminent arrival of Y2K. Despite Strache's unnerving interests, David Ritchie and Pete Kowatsch invited Strache to live with them as the third roommate in their two-bedroom house in Rhinelander, Wisconsin, during the summer of 1998. The trio split the expense of installing locks on the bedroom doors, and made clear to each other that privacy was expected. Strache and Ritchie had their own bedrooms, now with locked doors, and Kowatsch slept in his own private area in the basement.

At the time, Strache and his girlfriend Regina Domaika were in the throes of a tumultuous romance, which the district court opined might have been "charitably characterize[d] as a complex relationship." Indeed, Strache had asked Ritchie to pre-

vent him from bringing Domaika home with him in case Strache ever became drunk and entertained that unwise proposition. Evidently Ritchie failed Strache in this request because Strache returned to the house with Domaika in the early morning of Friday, August 22, 1998. They began discussing their chaotic relationship, and not long thereafter, an emotional argument between the two troubled lovers ensued.

According to Domaika, Strache leapt from bed early that morning, pointed a handgun to his head and yelled, "I'll show you how much I care." Domaika eventually managed to take the handgun from Strache and quickly absconded with it back to her own apartment only a few blocks away. Strache soon followed to her apartment and argued with her over possession of the firearm. About 5 a.m. that morning, Domaika twice called 911 emergency frantically exclaiming that Strache was suicidal and possessed a handgun. After Strache finally promised not to harm himself, Domaika returned the weapon to him, and Strache returned home. Nevertheless, Rhinelander Police Officer Lloyd Gauthier, Jr., promptly appeared at Domaika's residence in response to Domaika's 911 call and debriefed Domaika about the events of the night and Strache's current condition. Upon hearing her account, disquieted by the thought of a suicidal man armed with a lethal weapon, Gauthier rallied five police officers to Strache's house to check on him around 6:10 a.m.

Deputy Kurt Kopacz telephoned the house and spoke to Ritchie, who told him that there were four people in the house. Kopacz told Ritchie to get everybody out of the house into the backyard. All the assembled officers crouched outside with shotguns aimed at the back door as Ritchie, Kowatsch and Strache exited the house. The police immediately separated Strache from the others, handcuffed his hands behind his back and placed him inside a squad car.

Over the radio from Domaika's apartment, Gauthier directed the officers to secure the handgun that Strache, according to Domaika, had used earlier to threaten suicide. Kopacz asked Ritchie for permission to enter the house and search for additional people and weapons inside. Both Ritchie and Kowatsch consented immediately to the search, but no one asked Strache, who was segregated away from his roommates. While several officers entered the house, Strache desperately struggled to convince all within earshot that he was not suicidal as Domaika alleged. He said that Domaika would not have left him armed and alone if she really felt that he intended to commit suicide. Strache offered to show Officer Brian Zohimsky the arsenal in his bedroom to prove that Domaika's claim was unfounded and confused. Zohimsky testified that Strache "stated [the police] could go into the residence in order to locate the weapons he was referring to."

Officer Gauthier arrived at the scene and interrogated Strache briefly. Strache denied that he had threatened suicide and insisted that Domaika was lying about the events of the night. Gauthier returned to Domaika's residence to challenge her story, but Domaika stuck to her account and convinced Gauthier that Strache might still harm himself that night.

Before the police entered the house, Ritchie had warned the police that Strache stored a hand grenade, gun powder and other weapons in his bedroom. Wary, the police peered into Strache's room through the open door and noticed a shotgun and mounds of camouflage paraphernalia. When asked, Strache answered that there were only uncharged grenades in his room, but still concerned, the police brought Strache inside the house near his bedroom door to show them where the explosives were located. Strache sat in a chair at the doorway to his room and saw from this vantage where the police were searching. Although Strache was never informed of his *Miranda* rights, Officer David Kroll asked Strache whether he would mind if Kroll "took a look" inside Strache's room.

According to Kroll, Strache answered, "No, go ahead." Several officers testified that Strache was "calm, relaxed and cooperative" this entire time. The tone of the exchanges between Strache and police was "low-key and non-confrontational." Strache appeared to be in control of his faculties and understood what was transpiring. Both Zohimsky and Kroll testified that Strache had been "very cooperative" throughout, and Kroll believed that Strache would "let [the police] know if [they] were getting into an area that was going to be dangerous."

After discovering two capped lead pipes, the police concluded that they were in danger, quickly evacuated the house and summoned the special Emergency Operations Department unit ("EOD") to contain the scene. At that point, the police shipped Strache to St. Mary's Hospital for a mental health evaluation where he would remain over the weekend for observation.

In Strache's room, EOD found a fully constructed pipe bomb, which they quickly dismantled. A subsequent police search also yielded two partially constructed metal pipe bombs, one partially constructed PVC pipe bomb and three hand grenade shells with fuses and pin assemblies. Also lying about the room were a nine millimeter semiautomatic pistol, two twelve gauge shotguns, two practice Claymore mines, sections of steel and PVC pipe and matching steel and PVC end caps, fuses and fuse cords, a five pound can of gun powder and thirty-six blasting caps. Scattered around Strache's room was a veritable library of survivalist reference literature and how-to books including titles such as *Combat and Survival, American Survival Guide, Guerrilla Warfare, C-4 (Plastic Explosive)— Better than Ever Recipes for Half the Money and Double the Fun, How to Make War* and *Grenade Launcher*. Police also found a handwritten note that Strache had placed as a magazine advertisement in "American Survivalist Guide." Strache described himself in the note as a "SWM, 24, looking to join low profile group. Will

relocate. EX military MANY diversified skills and talents. Well trained and equipped. I am real. Don't contact unless you are as well."

Three days later on Monday, Gauthier visited Strache in the hospital mental ward. Gauthier told Strache that he wanted to ask some questions, and Strache responded that he wanted a lawyer with him before he answered them. Gauthier explained that they found pipe bombs, blasting caps and additional explosive material in his room. Strache responded that he understood all this and acknowledged that he consented to the police search of his room.

On February 18, 1999, a federal grand jury entered a one-count superseding indictment charging Strache with violating 26 U.S.C. § 5861(d) for possession of the following unregistered destructive devices found in Strache's room: (a) a fully constructed PVC pipe bomb; (b) a nearly completed PVC pipe bomb with shotgun pellets loaded inside, end caps attached and a cannon fuse in place; (c) three hand grenades equipped with fuses and which needed only insertion of plugs and some gun powder to become fully functional; (d) two partially completed metal pipe bombs missing only gunpowder and fuses to become fully functional. Strache filed a motion to suppress this evidence, alleging that he had not consented to the warrantless search of his room, but the court denied his motion.

On March 15, 1999, Strache pleaded guilty to possession of the functional PVC pipe bomb in violation of 26 U.S.C. § 5861(d). At sentencing, however, Strache challenged inclusion of the three partially completed hand grenades and two partially completed metal pipe bombs as items supporting a two-level upward enhancement of his sentence for possession of multiple firearms under U.S.S.G. § 2K2.1(b)(1)(B). Strache argued that he intended to use the grenades as smoke bombs for paintball and never intended to convert either the grenades or the metal piping into destructive devices. FBI Spe-

cial Agent Tom Deans testified in the presentence report ("PSR") that Strache could have made each grenade functional by simply inserting some explosive powder and a plug, which could be made from virtually any durable material, into the bottom of the grenade. Similarly, FBI Special Agent Tom Burg testified in the PSR that the partially completed metal pipe bomb needed only gun powder and a fuse to become fully functional. Duly noting Strache's how-to literature and survivalist paraphernalia, the district court found that Strache possessed the knowledge, tools and intent to convert the grenades and metal pipe bombs into destructive devices. The court then sentenced Strache to thirty months imprisonment and three years supervised release. Strache now appeals the denial of his motion to suppress and inclusion of the grenades and metal piping in enhancing his sentence under U.S.S.G. § 2K2.1(b)(1)(B).

## II. Analysis

### A. Consent to Search

■ Warrantless searches are presumptively unreasonable under the Fourth Amendment, but are permissible when the defendant voluntarily consents to the search. See Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Police searched Strache's house and bedroom without a warrant so the government bears the burden of establishing free and voluntary consent. See United States v. Navarro, 90 F.3d 1245, 1256 (7th Cir.1996). The district court decided that Strache consented to the search of his bedroom that produced the evidence supporting his conviction, and denied Strache's motion to suppress. Strache claims on appeal that he never voluntarily consented to the search. In reviewing the district court's denial of Strache's motion to suppress, we review questions of law de novo. See United States v. Trevino, 60 F.3d 333, 336 (7th Cir.1995). We review factual findings for clear error and reverse only when "left with the definite and firm conviction that a

mistake has been made." *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir.1994).

■ Strache's housemates Ritchie and Kowatsch consented to the initial police entry into the house and the search of the common areas. Consent from Ritchie and Kowatsch permitted police to search the entire house, except perhaps Strache's room, because consent from a joint occupant authorizes search of all areas where each occupant exercises joint authority. *See United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *United States v. Aghedo*, 159 F.3d 308, 310 (7th Cir.1998). We do not need to address whether consent from Ritchie and Kowatsch was sufficient to authorize search of Strache's private bedroom because Strache himself consented to that search.

■ Luckily for the police, Strache was determined to prove that he was not going to commit suicide and offered to show Officer Zohimsky the weaponry in his room. Without stepping inside Strache's room, police noticed a shotgun and some military paraphernalia through the open door to Strache's room. Warned and wary about Strache's explosives, Officer Zohimsky ushered Strache into the house and sat Strache in a chair outside the entrance to his bedroom. Officer Kroll asked Strache about explosives, and Strache replied that he kept uncharged grenades inside his room. Kroll asked whether Strache would mind if Kroll "took a look" at them. According to both Zohimsky and Kroll, Strache answered that the police could "go ahead." We grant great deference to the district court's determinations of the witnesses' credibility. *See United States v. Cardona–Rivera*, 904 F.2d 1149, 1152–53 (7th Cir.1990). In light of this uncontradicted testimony, the district court's finding that Strache consented to the search of his room was not clearly erroneous.

■ Still, Strache now contends that the police coerced him into involuntary consent to search. If this were so, police coercion would invalidate Strache's express consent to search. *See United States v.*

*Marshall*, 157 F.3d 477, 483 (7th Cir.1998). *Schneckloth* explains that "the question whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041. We consider the following criteria: (1) the age, education and intelligence of the defendant; (2) whether Strache was advised of his constitutional rights; (3) the length of detention prior to consent; (4) whether Strache consented immediately or police made repeated requests for consent; (5) whether physical coercion was used;(6) whether Strache was in custody. *See United States v. LaGrone*, 43 F.3d 332, 334 (7th Cir.1994). This determination of voluntariness does not rest on "the presence or absence of a single controlling criterion," but instead requires "careful scrutiny of all the surrounding circumstances." *Schneckloth*, 412 U.S. at 226, 93 S.Ct. 2041.

■ Strache paints a stark picture of himself as a mentally ill and suicidal young man accosted by a phalanx of police officers pressuring him into verbal consent to the search. But both Zohimsky and Kroll testified that Strache was "very cooperative," and Strache does not allege any antagonism, overt hostility or physical conflict between himself and the police. In fact, Kroll trusted that Strache would warn him and the other officers if they began rummaging in an area of danger. Furthermore, the police uniformly agree that Strache seemed lucid and clear-headed that night. Strache himself protested strenuously that he was calm and not a suicide risk, pointed out that he still had firearms in his room and offered to show them to the police. When Kroll asked Strache whether the police could look around in Strache's room, Strache consented immediately without repeated requests.

■ Strache complains that several factors suggest that his consent was given involuntarily as the result of police coercion. The police rousted Strache out of bed that morning, had him in custody and

failed to advise him of his rights. First, the police ordered Ritchie to get everyone out of the house in the middle of the night; however, unlike the nighttime search in *United States v. Jerez*, 108 F.3d 684, 692 (7th Cir.1997), where the police trapped the defendant inside his hotel room and kept banging on the door and window until the defendant acquiesced to search, the police here did not "refuse to take 'no' for an answer." Without prompting, Strache affirmatively offered to show the police his collection of weaponry, and Kroll asked only once before Strache consented to the search of his bedroom. Second, custody is not dispositive so long as the potentially coercive effect of custody was mitigated by the circumstances. *See United States v. Betts*, 16 F.3d 748, 753 (7th Cir.1994); *United States v. Duran*, 957 F.2d 499, 503 (7th Cir.1992). Strache was handcuffed, but the police did not badger him for information or consent, nor physically abuse or pressure him. Strache had been in police custody for only twenty minutes when he consented to search, and the district court concluded that "everything proceeded calmly, cordially and cooperatively." Strache was in custody and was not advised of his rights, but reviewing the totality of the circumstances, the district court's conclusion that Strache voluntarily consented to search was not clearly erroneous. *See also United States v. Dozal*, 173 F.3d 787, 796 (10th Cir.1999) (finding voluntary consent even though the police had the defendant in custody and did not inform him of his rights). We will affirm the district court's denial of Strache's motion to suppress.

### B. Upward Enhancement Under U.S.S.G. § 2K2.1(b)(1)(B)

The district court entered a two-level sentence enhancement under U.S.S.G. § 2K2.1(b)(1)(B) for possession of seven firearms. The commentary to § 2K2.1(b)(1)(B) defines "firearm" to include any "destructive device," and defines "destructive device" to include a bomb, grenade, mine or "any combination of parts either designed or intended for use in converting any device into any destructive device." *See* U.S.S.G. § 2K2.1(b)(1)(B) application notes 1, 4; *see also* 26 U.S.C. § 5845(a). Strache contends that he possessed only two destructive devices that qualify as a "firearm" under U.S.S.G. § 2K2.1(b)(1)(B): the completed PVC pipe bomb and the partially completed PVC pipe bomb. Strache argues that the three homemade hand grenades and two partially completed metal pipe bombs found in his bedroom are not destructive devices under U.S.S.G. § 2K2.1(b)(1)(B). Discounting those five devices, the district court could not have imposed an enhancement at all under U.S.S.G. § 2K2.1(b)(1)(B). When presented with components that are not fully constructed "destructive devices" but susceptible to use as a "destructive device" with further assembly, we look to the subjective intent of the defendant to possess the device for destructive purposes in determining whether the devices are "destructive devices" under U.S.S.G. § 2K2.1(b)(1)(B). *See United States v. Johnson*, 152 F.3d 618, 627 (7th Cir.1998) (defining "destructive device" under 26 U.S.C. § 5845(a), which U.S.S.G. § 2K2.1(b)(1)(B) incorporates by reference). We review for clear error the district court's factual findings in applying the Sentencing Guidelines. *See United States v. Gwiazdzinski*, 141 F.3d 784, 789 (7th Cir.1998).

Each hand grenade found in Strache's room needed only a plug fitted into its base to become fully operational. Each grenade had a primer and fuse, and FBI Special Agent Deans reported that Strache could easily fashion a plug from the material littering his room. The partially completed pipe bomb needed only gun powder and a fuse to become fully functional, both of which Strache had plenty in his bedroom. The grenades and metal pipe bombs were not functional devices yet, but Strache readily could convert them into operational destructive devices with minimal labor. Indeed, Strache already possessed a functional pipe bomb and a plethora of instructional manuals about explosives and the construction of

destructive devices. In addition, Strache's personal advertisement suggested a willingness and capacity for manufacturing destructive devices. The district court's determination that Strache intended to convert the grenades and metal pipe bomb into destructive devices was not clearly erroneous.

On a final note, Strache protested the citations to the PSR in the government's appellate briefing. Strache remonstrates that the parties may not cite to the PSR on appeal without the district court's permission because the PSR is confidential. Of course, the parties cannot cite to the PSR to support its statement of facts with respect to matters at trial because the PSR was not part of the factual record at trial. *See United States v. Menting*, 166 F.3d 923, 928 (7th Cir.1999). As such, the government should not have cited to the PSR for its recitation of facts regarding Strache's motion to suppress, and we have not considered it in deciding that claim. However, with respect to Strache's sentencing claim, citation to the PSR was appropriate because we consider the PSR in reviewing the district court's sentencing decisions when the district court adopted the PSR as findings of fact for sentencing purposes, as it did here. *See* Fed. R.Crim.P. 32(b)(6)(D); *United States v. Burke*, 148 F.3d 832, 835 (7th Cir.1998). Accordingly, even though it did not seek the district court's permission beforehand, the government was free to cite the PSR when addressing the district court's sentencing decision. Parties must seek district court approval only when seeking access or reference to the confidential PSR sentencing recommendation. *See United States v. Kahn*, 175 F.3d 518, 523 (7th Cir.1999).

### III. CONCLUSION

For the foregoing reasons, we AFFIRM Strache's conviction and sentence.