In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3933

United States of America,

Plaintiff-Appellant,

v.

Joseph N. Basinski,

Defendant-Appellee.


Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 196--David H. Coar, Judge.


Argued April 20, 2000--Decided September 5, 2000


  Before Manion, Rovner, and Williams, Circuit Judges.

  Manion, Circuit Judge.  While investigating
Joseph Basinski for jewelry theft, the government
learned that his friend William Friedman was
storing Basinski's locked briefcase in a barn in
Wisconsin, and that the briefcase probably
contained incriminating documents. Basinski had
previously instructed Friedman to burn the
briefcase, but never gave him the combination for
the lock nor explicit permission to open it.
Friedman never destroyed the briefcase; instead
he and two FBI agents retrieved it from the barn.
Although the government concedes that it easily
could have obtained a search warrant to open the
case, the agents decided not to and went ahead
and pried open the case with a screwdriver.
Basinski was later charged with obstruction of
justice and retaliating against a witness because
he reportedly attacked Friedman after he learned
that Friedman had given the briefcase to the
government. Basinski moved to suppress the
contents of the briefcase based on the
government's failure to obtain a warrant and the
lack of any exception to the warrant requirement.
The district court agreed with Basinski that no
exception to the warrant requirement existed and
suppressed the evidence. On appeal, the
government argues that the search was proper due
to either Friedman's consent or Basinski's
abandonment of the briefcase. Because neither
theory applies here, we affirm the district

court's decision to suppress the contents of the briefcase.

I.

In August 1997, Joseph Basinski learned that the FBI was investigating him for jewel thefts and interstate transportation of stolen goods. Shortly thereafter, in an effort to keep incriminating documents from the government, Basinski entrusted a locked briefcase to William Friedman, who hid it in a barn at his summer home in Grand Marsh, Wisconsin. Basinski had every reason to trust Friedman, as they had grown up in the same Chicago neighborhood and had been friends for over thirty years. Their relationship may also have extended to criminal activity. From time to time Basinski reportedly gave Friedman diamonds and pieces of jewelry for Friedman to sell, and Basinski was always generous with cash when it came to Friedman. But Basinski's trust only went so far. He never told Friedman what was in the plastic briefcase, never gave him the combination to the lock, and never gave him permission to open it. Around March 1998, after Basinski learned that the FBI had tapped his telephone, he instructed Friedman to burn the briefcase so that the FBI could never obtain its contents. When Friedman suggested that he could instead sink it in a lake, Basinski rejected that idea, stating that the FBI could still retrieve it. Friedman ultimately promised Basinski that he would burn the case.

As it turns out, Basinski's trust in Friedman was somewhat misplaced. Friedman decided not to burn the briefcase and instead left it hidden in the barn. When Basinski called him on several occasions to make certain that the case and its contents were destroyed, Friedman assured him that he had carried out Basinski's orders. To reassure himself that Friedman had carried out his commands, Basinski asked that Friedman tell him what was left of the briefcase and show him the remains. Friedman responded that only the handle and locking mechanism survived the fire, and that these were in a pile of burnt trash. When Friedman asked why he had to have the briefcase burned, Basinski told him he feared the FBI would otherwise obtain a passport and documents which contained Basinski's fingerprints. Basinski's fears were justified. After several interviews with the FBI and a grand jury subpoena, Friedman told the government about the briefcase and his belief that it contained evidence of Basinski's alleged crimes. On February 23, 1999, Friedman led FBI Agent Edward McNamara and Agent Craig Henderson to his locked barn where they retrieved the briefcase. Although the government almost certainly could have

obtained a warrant to search the contents of the briefcase, it elected not to do so, and instead the agents pried open the briefcase with screwdrivers and a hammer./1 The briefcase contained names of wholesale jewelers and information that would be useful to a jewel thief, such as combinations for locks belonging to the jewelers.

A few days after the search, Friedman demonstrated his divided loyalties by having his daughter contact Basinski in Las Vegas to inform him that the FBI had the briefcase. Apparently concerned, Basinski then arranged to meet with Friedman in Chicago. During the meeting Friedman confirmed that the FBI had the briefcase, at which Basinski expressed his displeasure. Subsequently, on March 23, 1999, Basinski and his friend Leonard Turow allegedly paid a visit to Friedman's home in the middle of the night. After Friedman opened the door Basinski allegedly attacked him. Basinski fled only when Friedman's wife called the police. Based on the attack, a federal grand jury indicted Basinski for retaliating against a witness and obstruction of justice. 18 U.S.C. sec.sec. 1513(b), 1503(a). Basinski moved to suppress any evidence concerning the contents of the briefcase based on his Fourth Amendment rights. The government argued that suppression would be improper because although it did not have a warrant for the search, it had Friedman's consent and, alternatively, Basinski had abandoned the briefcase. In a ruling from the bench, the district court rejected these arguments and suppressed the evidence. The government appeals. We have jurisdiction under 18 U.S.C. sec. 3731.

II.

The Fourth Amendment protects citizens against unreasonable searches and seizures. U.S. Const. amend. IV. A search is generally considered unreasonable unless the government obtains a warrant issued upon probable cause. Joy v. Penn-Harris-Madison Sch. Corp., 212 F.3d 1052, 1058 (7th Cir. 2000); United States v. Strache, 202 F.3d 980, 984 (7th Cir. 2000). There are, however, a number of exceptions to this general rule. See, e.g., United States v. Gevedon, 214 F.3d 807, 810 (7th Cir. 2000) (third-party consent); United States v. Marshall, 157 F.3d 477, 481(7th Cir. 1998) (exigent circumstances). Where the government obtains evidence in a search conducted pursuant to one of these exceptions, it bears the burden of establishing that the exception applies. United States v. Denberg, 212 F.3d 987, 991 (7th Cir. 2000); Strache, 202 F.3d at 984. It must do so by a preponderance of the evidence. Nix v. Williams, 467 U.S. 431, 444 n.5

(1984); United States v. Dickerson, 975 F.2d 1245, 1248 (7th Cir. 1992). Factual findings made in connection with a decision to suppress evidence are reviewed for clear error, while mixed questions of law and fact and pure questions of law are reviewed de novo. Strache, 202 F.3d at 984; United States v. Faison, 195 F.3d 890, 893 (7th Cir. 1999). When the government fails to demonstrate an exception to the warrant requirement, the evidence obtained through the search must be suppressed. United States v. Stefonek, 179 F.3d 1030, 1033 (7th Cir. 1999); United States v. Legg, 18 F.3d 240, 242 (4th Cir. 1994).

A.  Third-Party Consent

Because a person may voluntarily waive his Fourth Amendment rights, no warrant is required where the defendant consents to a search. United States v. Matlock, 415 U.S. 164, 171 (1974). Based on the concept of assumption of risk, this exception to the warrant requirement extends to consent legitimately obtained from a third party. Id.; United States v. Duran, 957 F.2d 499, 504 (7th Cir. 1992). Thus, where a defendant allows a third party to exercise actual or apparent authority over the defendant's property, he is considered to have assumed the risk that the third party might permit access to others, including government agents. Matlock, 415 U.S. at 171 n.7; United States v. Jensen, 169 F.3d 1044, 1049 (7th Cir. 1999). Third-party consent to a search can legitimately be given whether the premises to be searched are as expansive as a house or as minute as a briefcase. The key to consent is actual or apparent authority over the area to be searched. See United States v. Aghedo, 159 F.3d 308, 310 (7th Cir. 1998).

Here, Friedman clearly had no actual authority over the contents of the briefcase, so that leaves only the possibility that Friedman had apparent authority to consent to the search. Under the apparent authority type of third-party consent, the government must show that a reasonable person, with the same knowledge of the situation as that possessed by the government agent to whom consent was given, would reasonably believe that the third party had authority over the area to be searched. Illinois v. Rodriguez, 497 U.S. 177, 188 (1990); United States v. Chaidez, 919 F.2d 1193, 1201 (7th Cir. 1990); see Jenkins, 169 F.3d at 1049. For purposes of searches of closed containers, mere possession of the container by a third party does not necessarily give rise to a reasonable belief that the third party has authority to consent to a search of its contents. United States v. Karo, 468 U.S. 705, 726 (1984) (O'Connor, J.,

concurring); United States v. Rodriguez, 888 F.2d 519, 523 (7th Cir. 1989). Rather, apparent authority turns on the government's knowledge of the third party's use of, control over, and access to the container to be searched, because these characteristics are particularly probative of whether the individual has authority over the property. Matlock, 415 U.S. at 171 n.7; United States v. Duran, 957 F.2d at 504; Chaidez, 919 F.2d at 1201.

This analysis also entails the consideration of other, related factors. The first one is the nature of the container. United States v. Welch, 4 F.3d 761, 764 (9th Cir. 1993); United States v. Salinas-Cano, 959 F.2d 861, 864 (10th Cir. 1992); United States v. Block, 590 F.2d 535, 541 (4th Cir. 1978). Thus, for example, it is less reasonable for a police officer to believe that a third party has full access to a defendant's purse or a briefcase than, say, an open crate. Salinas-Cano, 959 F.2d at 864; United States v. Wilson, 536 F.2d 883, 885 (9th Cir. 1976) (defendant's girlfriend had no authority to consent to the search of suitcases left in her apartment where she disclaimed ownership of them). As one court has stated:

A briefcase is often the repository for more than business documents. Rather, it is the extension of one's clothing because it serves as a larger "pocket" in which such items as wallets and credit cards, address books, personal calendar/diaries, correspondence, and reading glasses often are carried. Few places outside one's home justify a greater expectation of privacy than does the briefcase.

United States v. Freire, 710 F.2d 1515, 1519 (11th Cir. 1983). Courts also look at external markings on the container--such as the defendant's name or the third party's name--in an effort to gauge the reasonableness of an officer's belief that the third party had use of the container. Rodriguez, 888 F.2d at 524-25. Because a reasonable person would be less likely to believe that a defendant granted free access to the contents of locked containers, also relevant are the precautions taken to ensure privacy, such as locks or the government's knowledge of the defendant's orders not to open the container. Salinas-Cano, 959 F.2d at 864; Block, 590 F.2d at 541. With respect to locking mechanisms, courts also consider whether the defendant provided the third party with a combination or key to the lock. United States v. Presler, 610 F.2d 1206, 1214 (4th Cir. 1979).

Analyzing the present case according to these factors, the government's attempt to show the

legitimacy of Friedman's consent falls short of the mark. It is undisputed that, although the exterior of the briefcase did not identify Basinski's interest in it, he was its sole owner, and from what Friedman told the agents, they had no reason to believe otherwise. The government also doesn't contest that, while Friedman had possession of the briefcase, he did not have access to the contents of the briefcase when he consented to the search. That is, the government agents knew that Basinski never gave Friedman the combination to the lock. They also believed that Friedman did not have any possessory interest in any of the contents of the case, and that the case had been locked from the moment Friedman received possession of it. Before they opened the case, the agents learned that Basinski implicitly, if not explicitly, instructed Friedman to never open the briefcase and to destroy its contents rather than allow anyone else to peer inside. Indeed, the agents knew that at no time did Friedman ever have access to, control over, or use of the interior of the case. The reasonableness of any belief to the contrary is negated by Friedman's statement to the agents that Basinski wouldn't give Friedman the combination to the lock even to destroy its contents. Accordingly, the only possible conclusion is that Friedman had no authority over the interior of the briefcase, and no reasonable agent could have believed otherwise.

The correctness of our conclusion is confirmed by the holdings of other courts that have addressed similar cases. For example, in United States v. Salinas-Cano, the defendant's girlfriend consented to the search of the defendant's unlocked suitcase that he had stored in her apartment. 959 F.2d at 862. The Tenth Circuit rejected the government's argument that the search was properly based on the girlfriend's apparent authority. It held that the search was unreasonable, even though the suitcase was unlocked, because a reasonable person would have known that people generally retain a high expectation in the privacy of closed suitcases, the searching officer knew that the suitcase belonged solely to the defendant and all of the contents of the case belonged solely to him, and the officer had no reason to believe that the girlfriend had ever been permitted to use the suitcase. Id. at 865. Similarly, in United States v. Welch, the Ninth Circuit held that, in light of the heightened expectation of privacy people have in purses and briefcases, security officers had no reasonable basis to believe that the defendant's boyfriend's control over her purse meant that he had actual or apparent authority to consent to a search of the purse. 4 F.3d at 764, 765; compare United States v. Infante-Ruiz, 13

F.3d 498, 504 (1st Cir. 1994) (police could reasonably believe that the defendant's friend had authority to consent to the search of the defendant's briefcase where both parties had access to the contents of the case, the defendant gave his friend permission to open the case, and the briefcase contained possessions of both the defendant and the friend).

In United States v. Jaras, the Fifth Circuit held that police officers could not reasonably believe that the defendant's friend had authority to consent to a search of the defendant's suitcase where the friend told the officer that the suitcases belonged to the defendant. 86 F.3d 383, 389 (5th Cir. 1996). And in United States v. Presler, a case particularly similar to the present one, the Fourth Circuit held that no person could reasonably believe that the defendant's friend (Houghton) had authority to consent to the search of the defendant's two locked briefcases. 610 F.2d at 1214. As the court stated:

The very act of locking them and retaining either the key or the combination to the locks on the two briefcases was an effective expression of the defendant's expectation of privacy. Nor can it be said that there was any suggestion that Houghton was given by the defendant any right of "general access" or of "mutual use" of the briefcases; the defendant's failure to give Houghton a key or combination to the locks was the clearest evidence that there was no intention on the defendant's part to give Houghton or anyone asserting under him "access" to the locked briefcases. Nor, as we have said, did Houghton claim any right of access. * * * By his own account, he received the briefcases solely for safekeeping. Such possession gave him no "common authority" over the contents of the locked briefcases and vested in him no power to consent to their search. And this was well known to the officers, for, as they admitted, Houghton told them the briefcases were not his but the defendant's, that he (Houghton) was merely entrusted with them for safekeeping, and that he had no key or combination to the locks on or right of access to the two locked briefcases.

Id. at 1213-14.

Based on our analysis and the reasoning of these similar cases, it is clear that Friedman had no apparent authority to consent to the search of Basinski's briefcase, and no reasonable government agent could believe that he did. The lack of any legitimate third-party consent means that the search of the briefcase was unreasonable unless the abandonment exception to the warrant

requirement is applicable.

B.   Abandonment

   Abandoned property is not subject to Fourth Amendment protection. Abel v. United States, 362 U.S. 217, 241 (1960); United States v. McDonald, 100 F.3d 1320, 1327 (7th Cir. 1996). This is because Fourth Amendment protection only extends to places and items for which a person has a reasonable expectation of privacy, and no person can have a reasonable expectation of privacy in an item that he has abandoned. Hester v. United States, 265 U.S. 57, 58 (1924); Bond v. United States, 77 F.3d 1009, 1013 (7th Cir. 1996). To demonstrate abandonment, the government must establish by a preponderance of the evidence that the defendant's voluntary words or conduct would lead a reasonable person in the searching officer's position to believe that the defendant relinquished his property interests in the item searched or seized. United States v. Stephens, 206 F.3d 914, 917 (9th Cir. 2000); Bond, 77 F.3d at 1013. Because this is an objective test, it does not matter whether the defendant harbors a desire to later reclaim an item; we look solely to the external manifestations of his intent as judged by a reasonable person possessing the same knowledge available to the government agents. United States v. Rem, 984 F.2d 806, 810 (7th Cir. 1993); United States v. Hedrick, 922 F.2d 396, 397 (7th Cir. 1991); United States v. Liu, 180 F.3d 957, 960 (8th Cir. 1999)./2 We look at the totality of the circumstances, but pay particular attention to explicit denials of ownership and to any physical relinquishment of the property. United States v. Chandler, 197 F.3d 1198, 1200 (8th Cir. 1999); Liu, 180 F.3d at 960; United States v. Ramos, 12 F.3d 1019, 1025 (11th Cir. 1994).

   There are three general types of abandonment cases, which are based on these two indicia of abandonment. The first type is characterized by the presence of a fleeing defendant who relinquishes an object to make his flight easier or because discarding the item might make it easier for him to later claim that he never possessed it. See, e.g., California v. Hodari D., 499 U.S. 621, 624 (1991); Hester, 265 U.S. at 58. Because he has disposed of the property in a location that affords easy access to the public, a reasonable person would believe that the defendant's possessory interest in the property is so eroded that anyone has a right to retrieve it. The second type of case is closely related to the first, for in so-called "garbage cases" the defendant places material in or near a refuse receptacle that is readily accessible to the public, and in which he usually places other

discarded materials. See California v. Greenwood, 486 U.S. 35, 40-41 (1988); United States v. Redmon, 138 F.3d 1109 (7th Cir. 1998) (en banc); Hedrick, 922 F.2d at 397. By this conduct and the location of the receptacle, the defendant leads reasonable people to believe that he no longer cares what becomes of his trash, or articles mistaken for trash. In the third type of case, the defendant is usually caught red-handed with or near a container of contraband, whereupon he denies that the container or its contents are his. See, e.g., McDonald, 100 F.3d at 1327; Bond, 77 F.3d at 1013. Taken at face value, this denial makes it reasonable to conclude that the defendant claims no possessory interest in the items.

The fact that this present case does not fit into any of these three categories strongly suggests that no abandonment occurred. The present case stands in stark contrast to the three scenarios because Basinski never explicitly disclaimed a privacy interest in the briefcase and never placed the briefcase in an area readily accessible to the public, such as an area usually reserved for abandoned items like trash. The other relevant facts don't help the government's case either. Rather than manifesting abandonment of his briefcase, Basinski's conduct demonstrates a strong desire to preserve both his possessory and privacy interests. Specifically, he entrusted the locked briefcase to a life long friend so that Friedman might hide it on private property owned by Friedman, in a locked barn, surrounded by a locked gate, in a remote part of Wisconsin which was visited only infrequently by Friedman and his family. Basinski also exhibited a continued privacy interest in the briefcase by specifically asking Friedman to keep the case hidden in a private place, until the time he asked him to destroy it. And Basinski allowed Friedman to retain the case, initially because Friedman assured him it was secure, and subsequently only because Friedman told him it was destroyed beyond recognition. Thus, Basinski's conduct could hardly be interpreted as a statement that he no longer cared what became of his briefcase.

This leads us to the government's argument that the request to destroy the briefcase necessarily entailed an abandonment of the case. The government essentially interprets Basinski's order to "burn the briefcase so that nobody will ever see its contents" to mean "I don't care if anyone sees the contents of the briefcase, or even what happens to it." We disagree with this interpretation because it is not objectively reasonable and is completely contrary to the undisputed facts. By ordering Friedman to destroy

the briefcase, Basinski did not invite all the world to rummage through the briefcase at will, as a defendant in abandonment situations essentially does. Rather, his command manifested a desire that nobody possess or examine the contents of the briefcase. And even after he gave this order, he continued to manifest a desire to exclude others from seeing its contents. Gudema v. Nassau County, 163 F.3d 717, 722 (2d Cir. 1998) (defendant retains legitimate expectation of privacy where he vigilantly protects his right to exclude others). When Friedman advised Basinski to submerge it in a lake, Basinski nixed that suggestion with the reminder that people (particularly the FBI) could still retrieve the case. Furthermore, Basinski exhibited his continued desire to retain a privacy interest in the case by declining to give Friedman the combination for the briefcase's lock. And in instructing him to burn the case, the implicit understanding was that it would be accomplished at the farm in Wisconsin, a remote location far from the prying eyes of the public. Thus, rather than indicating to reasonable people that they were free to do what they wanted with the briefcase, Basinski's orders to burn it unequivocally indicate that he wanted the contents to remain permanently private.

Of course, whatever his motives, Friedman did the legally correct thing by not destroying a briefcase which he believed contained evidence of a crime, notwithstanding the lies he may have told Basinski. But contrary to the government's arguments, Friedman's decision not to burn the briefcase does not diminish Basinski's privacy interest in the case. Whether Friedman is viewed as a bailee or a converter of property, Basinski still retained a legitimate expectation of privacy in the contents of the briefcase, particularly because it remained locked. Gudema, 163 F.3d at 722 (stolen case containing a police shield); United States v. Knoll, 16 F.3d 1313, 1321 (2d Cir. 1994) (closed boxes containing files stolen from attorney's office); United States v. Sumlin, 909 F.2d 1218, 1220 (8th Cir. 1990) (stolen purse); United States v. Barry, 853 F.2d 1479, 1481, 1482 (8th Cir. 1988) (locked suitcase). The FBI agents had no reason to believe otherwise. Their information about Friedman's possession of the case made it clear that he was either a converter or bailee, and that Basinski continued to retain a privacy interest in the case. Although Friedman could have destroyed Basinski's expectation of privacy by, for example, abandoning the briefcase himself, Friedman could not have effected an abandonment under the facts of the present case because the agents knew that the briefcase was entrusted to his care. See United States v.

O'Bryant, 775 F.2d 1528, 1534 (11th Cir. 1985).
Accordingly, the abandonment theory will not
insulate the government from the consequences of
its decision not to obtain a warrant.

III.

   Basinski retained a legitimate expectation of
privacy in the locked briefcase that he entrusted
to his lifelong friend, William Friedman. To
search it, the government needed a warrant or an
applicable exception to the warrant requirement.
Friedman did not have actual or apparent
authority to consent to a search of the
briefcase, and no reasonable agent could believe
otherwise. Similarly, no reasonable agent could
have believed that either Basinski or Friedman
abandoned the briefcase, thereby foreclosing that
theory. Because there is no exception to the
warrant requirement applicable to this case, the
search of Basinski's briefcase violated the
Fourth Amendment, and the evidence obtained
pursuant to the search must be suppressed. The
district court's suppression order is, therefore,

AFFIRMED.




/1 Agent McNamara stated in an affidavit that he
opened the briefcase to ensure that it was the
right one, as Friedman thought Basinski's
briefcase was a lighter color. At oral argument,
however, the Assistant United States Attorney
told us that he and other AUSAs were fully aware
of the location and the facts surrounding the
briefcase, and concluded that the law did not
require them to obtain a warrant to open it. They
therefore instructed the agents, before they
retrieved the briefcase, that no warrant was
necessary.

/2 There is also a subjective component to the
abandonment analysis in the sense that a
defendant who is trying to show that he did not
abandon property must also demonstrate that he
actually expected the item to remain private. See
Katz v. United States, 389 U.S. 347, 361 (1967)
(Harlan, J., concurring); United States v. Meyer,
157 F.3d 1067 (7th Cir. 1998) (to establish a
reasonable expectation of privacy a defendant
must show an actual, subjective expectation);
United States v. Garzon, 119 F.3d 1446, 1449
(10th Cir. 1997). But because the government
agreed before the district court that the
suppression motion could be decided without a
hearing or further evidence, it has waived any
argument that Basinski did not actually have an
expectation of privacy in the contents of the

briefcase. Regardless, the record indicates that Basinski had such an expectation and that it was reasonable.