**UNITED STATES of America,**
**Plaintiff,**

v.

**Roland MEANS, Defendant.**

**No. 04–CR–23.**

United States District Court,
E.D. Wisconsin.

Dec. 28, 2004.

Elizabeth Blackwood, for Plaintiff.

Mark D. Richards, for Defendant.

### *MEMORANDUM AND ORDER*

ADELMAN, District Judge.

### I.  BACKGROUND

On January 7, 2004, at about 6:00 p.m., City of Milwaukee police officers Virgil Cotton and Ray Harris stopped a white Dodge Durango driven by defendant Roland Means, allegedly because he ran the stop sign at the intersection of North 38th Street and West Lloyd Street. The officers stopped the vehicle in front of 2015 North 36th Street, a building owned by defendant's family. After stopping defendant, the officers discovered an outstanding municipal warrant for him. They arrested him and conducted a search of his person and the Durango, finding a bag of suspected cocaine and a gun. Other officers soon arrived on the scene, and they then spent the next three plus hours searching the 36th Street building and a

building located at 2201–2203 North 38th Street, which was also associated with defendant.

Defendant moved to suppress the cocaine and the gun, arguing that he stopped at the stop sign at 38th and Lloyd and that the police thus lacked probable cause to pull him over. He argues that prior to the traffic stop the police had information that he was engaged in illegal drug activity—information not amounting to probable cause—and that the traffic stop was a pretext to search for drugs. He contends that the prolonged police searches of the 36th Street and 38th Street residences support his contention.

A magistrate judge held a hearing and recommended that defendant's motion be denied. Represented by new counsel, defendant argued that important evidence regarding the searches of the 36th and 38th Street properties had not been presented and requested a de novo hearing, which request I granted. At the end of the first day of the hearing, the officers' explanation of how a seemingly straightforward traffic stop burgeoned into a three-hour, multiple building search was so unclear that the AUSA felt compelled to advise the court that "it's probably pretty obvious that there is more than meets the eye in this case.... Of course, it is the government's position that the traffic stop was coincidental. But I don't know if the Court's going to be comfortable believing the witnesses who have said very clearly that they had no information about Mr. Means prior to the traffic stop." (Tr. at 124–25). Thus, the AUSA requested and I granted a continuance of the hearing.

On the second day of hearing, the government presented testimony from Cotton and Harris's sergeant, Chris Brown, who admitted that on January 7 a detective asked him to look for a white Durango that might be carrying narcotics but nevertheless asserted that Cotton and Harris's stop of defendant was a coincidence. Brown testified, however, that the detective directed the subsequent searches.

On review of the record and the parties' post-hearing briefs, I conclude that the government has not met its burden of establishing by a preponderance of the evidence that there was probable cause for the traffic stop. In this memorandum, I explain my reasons for reaching this conclusion.

## II. DISCUSSION

### A. Applicable Law

■ The Fourth Amendment protects citizens against unreasonable searches and seizures. U.S. Const. amend. IV. A search is generally considered unreasonable unless the government obtains a warrant issued upon probable cause. There are, however, a number of exceptions to this general rule. Where the government obtains evidence in a search conducted pursuant to one of these exceptions, it bears the burden of establishing by a preponderance of the evidence that the exception applies. *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir.2000).

■ Police may reasonably conduct a warrant-less stop of an automobile if they have probable cause to believe that a traffic violation has been committed. *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). The determination of whether probable cause existed is an objective one, making the subjective intent of the officers in conducting the stop irrelevant. *Id.* at 813, 116 S.Ct. 1769.

Police may also conduct a warrant-less search of an individual incident to his lawful arrest. *United States v. Robinson*, 414 U.S. 218, 234, 94 S.Ct. 467, 38 L.Ed.2d 427

(1973); *see also Michigan v. DeFillippo*, 443 U.S. 31, 35, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979) ("Under the Fourth and Fourteenth Amendments, an arresting officer may, without a warrant, search a person validly arrested."). Likewise, the police may, on the arrest of a driver, search the automobile he was operating. *United States v. Lewis*, 910 F.2d 1367, 1371 n. 2 (7th Cir.1990)(citing *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981)).

## B. Analysis of the Evidence

■ At the time that officers Cotton and Harris stopped defendant's vehicle, they were part of an "area saturation patrol" ("ASP"), a special unit that handles complaints of drug dealing, prostitution and the illegal use of weapons in Police District 3. An ASP unit functions as a team and usually patrols in a caravan of five or six squads cars, with each squad containing multiple officers. Cotton and Harris testified that on January 7 they were on routine patrol traveling south on North 38th Street, with a squad containing officers Paul Lough and James Campbell behind them, when they observed a white Dodge Durango turn left from 38th onto Lloyd without stopping at the stop sign. They testified that they had no information about and were not looking for defendant or a white Durango.

Defendant testified that on January 7 he and Peter Glover had been doing rehab work on several properties owned by his family, including 2201–03 North 38th Street. He stated that after completing their work they picked up his thirteen-year-old son from school and were proceeding to the property at 2015 North 36th Street (where Glover lived) to retrieve some tools and talk about the next day's work schedule. En route, Glover asked defendant to pull over and let him out at a store on the corner of 38th and Lloyd so that he could buy some beer and talk to two people in the store. Defendant and Glover both testified that defendant came to a complete stop and let Glover out before turning left onto Lloyd.

Defendant testified that while proceeding east on Lloyd he saw an unmarked police car approaching from the opposite direction. After it passed, defendant observed the vehicle pull into an alley between 38th and 39th Streets and turn around as if to follow him. Defendant testified that he turned onto 36th Street, pulled over in front of 2015 North 36th and exited the Durango. He then heard someone shout, "put your hands up," (Tr. at 77), turned and saw Harris. Defendant asked Harris why the police had stopped him, and Harris said that they were looking for a tan vehicle. Defendant testified that Harris then took various sets of keys from his person and tried to use them to open the door of the 36th Street property. Unsuccessful, Harris asked defendant, "MF, what keys go to what?" (Tr. at 71.) Defendant did not respond.

For several reasons, I conclude that defendant's version is more credible than the government's. First, the nature of Cotton and Harris's assignment at the time of the stop as well as some of the events preceding the stop are consistent with a conclusion that the officers were looking for defendant and/or his vehicle. The purpose of an ASP unit is not to enforce the traffic code but to respond to complaints about drug dealing, shootings and other "life-type violations." (Tr. at 133.) ASP Sergeant Brown testified that prior to the stop Detective Kevin Armbruster advised him that he had some information about a white Durango possibly carrying a "large quantify of narcotics." (Tr. at 135.) Brown testified that although he did not "believe" he passed the information on to

others in the unit, it was "possible" that he did so. (Tr. at 136, 149.) Further, the manner in which the ASP was patrolling at the time of the stop supports an inference that the officers were looking for a specific vehicle: contrary to their usual practice, the squads were not traveling in a caravan but were split up, as they reasonably would have been if engaged in a search. Brown said that he did not regularly share with his officers information he received from detectives because he was usually in the lead car of the ASP caravan and thus could order a stop if he saw something of interest. However, he was not in the lead when this stop occurred. Finally, the officers' testimony concerning their knowledge about defendant's being a subject of police suspicion was evasive and contradictory. For example, defense counsel asked Cotton whether he or other officers in the unit "had any information whatsoever" about defendant or his properties, and Cotton replied that they "absolutely" did not. (Tr. at 27.) However, on re-direct, Cotton qualified his answer, stating that although he did not know that defendant was a subject of suspicion at the time of the stop, he learned later that evening from his sergeant or another officer in the unit that the police had a previous interest in defendant. On the other hand, Harris and Lough testified that they never learned that defendant was the subject of some greater investigation.

Second, Cotton and Harris contradicted one another concerning the specifics of the alleged traffic violation. Cotton said that the Durango's brake lights illuminated and that the vehicle "almost" stopped at the stop sign. (Tr. at 21, 29.) Harris, on the other hand, testified that the Durango failed to brake at all and just went through the stop sign (despite the fact that both officers testified to slippery road conditions). The government speculates that Harris may have been checking his rear view mirror, using the radio, or looking at his partner when the lights illuminated, but this is contrary to Harris's unequivocal testimony that he had a "clear view" of the Durango when it ran the stop sign. (Tr. at 44.) The government also argues that the discrepancy is irrelevant: the violation was in failing to come to a complete stop, not in failing to brake sufficiently. True enough, but the significant differences between these two officers who claimed to witness the same thing cast doubt on the credibility of their assertion that there was any traffic violation at all.[1]

Third, the officers' testimony concerning their conduct after the traffic stop casts further doubt on their credibility. Cotton testified that the traffic stop evolved into something more when officers saw someone run *out* of 2015 N. 36th Street, causing officers to pursue that individual.[2] However, Lough's report stated that someone *entered* the property, causing officers to walk inside to clear the building of trespassers.

Cotton was evasive as to whether and why officers entered the 36th Street property:

Q. Did you ever go in the residence at 2015 North 36th?

A. We were outside the location.

Q. Are you aware of any officers going in that residence?

---

1. Cotton and Harris also contradicted each other about the discovery of the gun. Cotton said Harris noticed it first, while Harris said Lough found it after defendant's arrest.

2. The pursuing officers arrested the individual they believed had fled, one Walter Missouri, at 2162 N. 41st Street. However, it turned out that Missouri had no connection to 2015 N. 36th Street or Roland Means.

A. No, I am not sure who went inside, no.

Q. So you know some officers went inside the residence?

A. Again, the information I got was someone fled from the residence, but I don't know who it was or who went inside the house.

Q. Okay. I guess what I am trying to get at, officer, is you know that officers went in the residence located at 2015 North 36th.

A. That's what I understand, yes. But I don't know who it was.

(Tr. at 20–21.)

Brown's testimony suggested that he ordered the entry into 2015 N. 36th Street:

I don't know that I told officers to specifically go in here, open that door, look under here. These are very experienced officers that when they are tasked with the responsibility, they quite often know how to accomplish that responsibility. . . . Aside from probably just generally saying clear that building, I don't recall anything more specific than that.

(Tr. at 154–55.) Brown later said that he had officers search 36th Street because he received contradictory information from defendant: first defendant said the building was vacant, then he said he was dropping the juvenile off there, then he indicated he was picking the juvenile up from that address. However, Brown's knowledge as to what defendant did or said after the stop was suspect. For example, he testified that defendant "resist[ed] the officers." (Tr. at 169.) No other officer said this.[3]

The officers' statements about what happened inside 2015 N. 36th Street also diverged wildly. ASP Officer Alphonso Glover testified that he and fellow ASP Officer Joseph Goggins entered the building and observed that it contained multiple apartments. He testified that they knocked on the door of the ground floor unit to determine whether it was occupied, and a man later identified as Sevell Robey answered the knock, admitted them to his apartment and was at all times cooperative. He testified that Robey was arrested for marijuana possession and that the arrest went entirely peacefully.

Notwithstanding Glover's testimony, the State of Wisconsin filed a criminal complaint against Robey, based on Goggins's statements, charging him not only with possession of marijuana but also with obstructing an officer. The complaint alleged that the officers ordered Robey to show his hands and lie down on the floor, and that Robey refused to comply and approached them with clenched fists. When they attempted to take him into custody, Robey resisted, and a struggle ensued.

Robey testified that he was asleep in his apartment when several officers busted in his door. Robey denied obstructing the officers, stating: "They just came in." (Tr. at 93.)[4] The defense introduced a photograph of Robey's door showing that it had been kicked in. Officer Glover said he had no idea how the door was kicked in as depicted in the photograph. The other officers who testified on the first day of the hearing also denied any knowledge of doors being kicked in. However, the "CAD" print out, which detailed the officers' calls to the dispatcher, indicated that officers called for a "board up" at 2015 N.

---

**3.** It is also significant that although the officers testified that defendant claimed ownership of 2015 N. 36th Street, no one asked defendant's permission to enter the building.

**4.** I observed Robey testify, and based on his peaceful demeanor and slight physique find it highly unlikely that he physically menaced or resisted the officers.

36th Street (Ex. 17), and Brown testified that when he entered the property later on the evening of the search he observed that two to four doors had been kicked in. Adding yet another contradiction, Lough's report (ostensibly the only report prepared regarding this search) stated that "all the apartment doors" were "ajar" when the officers entered. (Tr. at 61.)

The officers' testimony concerning the search of the 38th Street property was similarly evasive and contradictory. Cotton admitted that he and other officers went there, but he was unclear as to why: he thought maybe the owner of the Durango lived there and they were trying to establish whether defendant had permission to drive it, despite the fact that there was no report that the vehicle had been stolen or that the Durango listed to that address. Harris said that officers went to 38th Street "to search for people or something" and that he just "followed the sergeant." (Tr. at 51.) Officer Glover denied going to 38th Street, even though the CAD print out showed that his unit went there. Brown said that officers went to 38th Street at Armbruster's direction to perform a "knock and talk." (Tr. at 140.)

Once the officers arrived at 2201–03 N. 38th Street, it is unclear how they got in. Cotton, Harris and Lough seemed to acknowledge that someone may have taken defendant's keys but refused to say who.[5] Cotton chose his words carefully, stating that he "didn't personally see him [Harris] take keys, no." (Tr. at 26.) Lough said that he did not take defendant's keys "but it is possible that someone might have took them." (Tr. at 66.) Harris similarly testified that he did not take the keys but "[t]here were plenty officers there. A lot of stuff was going on that night." (Tr. at 54.)

Concerning the manner of entry, Harris stated that someone from the inside opened the door and let the officers in, but he could not tell who it was because he was behind other officers. Brown initially stated that when they arrived officers found "an open door in the lower unit [so] we went in to search for possible burglars, possible crime."[6] (Tr. at 150.) Later, Brown stated that the upper tenant, Sebrenna Sprewell, met them at the "front door of the upper unit." (Tr. at 151.) However, he did not explain how they got in the outer door. Brown denied that he searched Sprewell's apartment, but acknowledged that his officers may have.[7] No police reports were prepared regarding the 38th Street search.

The government argues that I should focus narrowly on the traffic stop, and that I need not pass on the credibility of each officer involved in what became a complicated incident. The government acknowledges that in their zeal to find drugs, some of the officers may have overreached. Nevertheless, it contends that the only factual finding I need to make is whether

---

5. It is undisputed that defendant had on his person at the time of his arrest keys to both properties searched by police, 2015 N. 36th Street and 2201–03 N. 38th Street.

6. This was despite the fact that there was no report of burglars or any suspicious activity at the address.

7. Sprewell testified that she heard someone banging on the outside door. She went downstairs, and an officer told her that some-

one had called in a burglary and that they had to make sure no one was in the property. Sprewell said that she cracked the door and several officers came in and ran up the stairs. She denied that she invited the officers in or that they asked her for permission to enter. She stated that they proceeded to search her apartment and made her sit down. She testified that the officers also entered the lower unit and searched it. She said that the lower was locked before the officers arrived.

the officers had probable cause for the traffic stop. I agree that the issue to be resolved is whether there was probable cause, but in assessing the credibility of the testimony concerning that issue I cannot ignore the testimony concerning subsequent actions.

For the reasons stated above, I am not convinced that there was probable cause to stop defendant's vehicle. Under the totality of the circumstances, the defense version is more credible. Defendant and Peter Glover both testified that defendant came to a complete stop at the intersection of 38th and Lloyd Streets to let Glover out at the corner store. I find it improbable that they invented the trip to the store. The government claims that the story is implausible because defendant did not wait for Glover, despite inclement weather conditions. However, Glover testified that the store was just a three or four minute walk from his apartment on 36th Street, and both defendant and Glover testified that Glover wanted to speak to some people he saw at the store. Thus, there was nothing unusual in defendant's continuing on to 36th Street to pick up tools with the understanding that Glover would meet him there.[8]

The government argues that Glover had a motive to fabricate his testimony because defendant was his employer and landlord. However, Glover denied that he was dependent on defendant for his income, stating "I can go out and find somebody else." (4/7/04 Hr'g Tr. at 38.)[9]

The government also claims that defendant, a convicted felon facing sentence as an armed career criminal, has a motive to fabricate. I observed defendant's demeanor and found his testimony straightforward and credible. Defendant's status as a felon does not automatically render suspect anything he says.

## III. CONCLUSION

**THEREFORE, IT ORDERED THAT** defendant's motion to suppress (Docket # 14) is **GRANTED**.

**IT IS FURTHER ORDERED THAT** this matter is scheduled for **TELEPHONIC STATUS** on *Tuesday, January 4, 2005, at 11:30 a.m.*

---

**8.** The government notes that defendant's son did not testify. However, I do not find it odd that defendant would not want to involve his thirteen-year-old son in the matter.

**9.** Glover did not testify before me, but the parties agreed that I could consider his testimony before the magistrate judge. Glover's testimony jibed with that of defendant, whom I found credible. The magistrate judge who saw Glover testify made no findings on his

demeanor; instead, he found that Glover had a motive to fabricate because defendant was his employer. However, as noted, Glover also testified that he could find another employer, testimony that the magistrate did not address in his oral decision. Finally, the magistrate judge did not hear a great deal of the testimony taken before me concerning the officers' actions after the stop, which, as discussed, casts doubt on their credibility.