UNITED STATES of America, Plaintiff–Appellee,

v.

Dale BURKE, Defendant–Appellant.

No. 97–3620.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 23, 1998.

Decided July 2, 1998.

Stephen B. Clark (argued), Office of the United States Attorney, Criminal Division, Fairview Heights, IL, Michael C. Carr, Office of the United States Attorney, Benton, IL, for Plaintiff–Appellant.

Lawrence J. Fleming (argued), Office of the Federal Public Defender, East St. Louis, IL, for Defendants–Appellees.

Before EASTERBROOK, RIPPLE and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Dale Burke pled guilty to conspiracy to distribute and possess with intent to distribute LSD, methamphetamine, and marijuana. The district court sentenced him to 188 months' imprisonment, five years' supervised release, and a $2,000 fine. He appeals several aspects of his sentence. We affirm.

## I. HISTORY

The issues in this appeal are very factually specific. We give here only an overview of the facts, filling in the pertinent details in the analysis.

Burke took part in a drug distribution network. He obtained drugs from Arizona for resale in southern Illinois. Burke was eventually indicted for conspiracy to distribute and possess with intent to distribute LSD, methamphetamine, and marijuana. Two of his co-conspirators, Timothy Conway and Christopher McRoy, gave lengthy statements to investigators which were highly prejudicial to Burke. Their statements were detailed and contained estimates of how much of each drug Burke dealt, but many of their estimates were based on second-hand information. After receiving McRoy's statement but not Conway's, Burke agreed to plead guilty.

Although the plea agreement did not specify a quantity of drugs for which Burke was responsible, Burke's counsel and the AUSA informally estimated that Burke would be responsible for about 400 kilograms of marijuana equivalent. However, the Presentence Investigation Report ("PSR") recommended responsibility for marijuana equivalent of 683.4 kilograms. Burke filed objections to

the PSR, particularly objecting to the drug quantity calculations based on McRoy's and Conway's hearsay–filled statements. In contrast to the PSR, Burke estimated his own drug responsibility at 213.0 kilograms of marijuana equivalent. Base level 24 results from 100–400 kilograms of marijuana equivalent; base level 28 results from 400–700 kilograms of marijuana equivalent.

Burke moved to compel the Government to produce several witnesses at the sentencing hearing, including Conway and McRoy. The court initially denied this motion. At the sentencing hearing the court heard from investigators and from Burke and then decided to compel the Government to produce Conway and McRoy. After hearing their testimony, the court adopted the PSR in its entirety except for its finding that Burke had accepted responsibility for his actions. The court sentenced Burke to the highest sentence in his Guideline range, 188 months.

## II. ANALYSIS

Burke appeals two aspects of his sentence. First, he argues that the district court erred in determining his relevant conduct. Second, he argues that the district court should not have included two traffic offenses when calculating his criminal history.

### A. *Relevant Conduct*

#### 1. Legal Objections

Burke offers several reasons why the district court erred in determining that he was responsible for 683.4 kilograms of marijuana equivalent.

#### i.

Burke argues that the district court failed to explain how it reached the conclusion that he was responsible for "just under 700 kilograms" of marijuana equivalent. Burke argues that failure to set forth specifically how the district court reaches its conclusion is reversible error requiring us to remand his case for resentencing. We disagree.

 After three partial days of sentencing hearings, the district court announced that "this Court adopts the Presentence Investi-

gation Report in its entirety as the findings of this Court with the exception of paragraph 42 in which this Court is taking away the three points for acceptance of responsibility that this Court believes that this defendant does not deserve in any way, shape or form." Sentencing Hr'g at 79–80, *United States v. Burke*, No. 96–40094 (S.D.Ill. Nov. 10, 1997). To adopt the PSR *is* to make factual findings. "Except for any unresolved objection under subdivision (b)(6)(B), the court may, at the hearing, accept the presentence report as its findings of fact." Fed.R.Crim.P. 32(b)(6)(D). " 'Provided that the facts contained in a PSR bear sufficient indicia of reliability to support their probable accuracy, the district court may adopt them as support for its findings and conclusions regarding the quantity of drugs attributable to a defendant.' " *United States v. Edwards*, 115 F.3d 1322, 1327 (7th Cir.1997) (quoting *United States v. Taylor*, 72 F.3d 533, 543 (7th Cir. 1995)); *see also United States v. Taylor*, 135 F.3d 478, 483 (7th Cir.1998). For uncontroverted matters, the district court need not make independent factual findings.

#### ii.

Burke argues that the district court made insufficient findings as to controverted matters, such as how many trips to Arizona he made or how much LSD he dealt. It is true that we require a sentencing court to make specific findings when the defendant objects to the PSR and cannot resolve the difference with the Government before sentencing. *See United States v. Cureton*, 89 F.3d 469, 472 (7th Cir.1996). In this case the district court made sufficient findings. "The Court listened to three days of testimony, reviewed exhibits.... So the Court is very confident that the pieces of the puzzle come together today through the testimony of Mr. Conway, Mr. McRoy and Ms. Johnsen.... The Court finds that the testimony of Mr. Conway was credible. The testimony of Mr. McRoy is credible.... There's a lot of corroboration here in terms of the amount of drugs that was involved.... It will therefore be the finding of this Court that this Court adopts the Presentence Investigation Report in its entirety as the findings of this

Court [except for acceptance of responsibility]." Sentencing Hr'g at 77–79.

■ While more detail is always better than less in sentencing findings, we find no error here. When the defendant objects to the PSR, the district court must (1) "address[ ] all of the defendant's objections prior to sentencing, and (2) provide[ ] a record of the resolution of the defendant's objections for the appellate court, prison officials, or other authorities that may later rely on the presentencing report." *Cureton*, 89 F.3d at 473. The district court did as much here. The district court obviously considered the testimony and exhibits and made a calculated decision to adopt the PSR as its findings in all but one respect. A court's reference to the PSR constitutes sufficient findings even as to controverted facts when we are assured that the district court made a decision of design, rather than of convenience, to adopt the PSR. *See United States v. McKinney*, 98 F.3d 974, 981 (7th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1119, 137 L.Ed.2d 319 (1997). "The reference to the findings and rationale in the presentence report allows us, as a reviewing court, to evaluate the district court's decision, and that is all that is required." *Taylor*, 135 F.3d at 483 (citing *United States v. Pippen*, 115 F.3d 422, 424 (7th Cir.1997)); *United States v. Carson*, 9 F.3d 576, 584 (7th Cir.1993).

### iii.

Burke also discredits the method the district court used to calculate his relevant conduct as to methamphetamine and marijuana. The district court, following the PSR, multiplied the number of times Burke traveled to Arizona by the amount of methamphetamine and marijuana bought on each trip to reach a total. Burke argues that this method of calculation is inherently unreliable.

■ We have approved of this method of calculation so long as the data plugged into the formula are sufficiently reliable. *See United States v. James*, 113 F.3d 721, 731 (7th Cir.1997); *United States v. Acosta*, 85 F.3d 275, 282 (7th Cir.1996); *United States v. Robinson*, 30 F.3d 774, 787 (7th Cir.1994). Burke argues that other circuits have disavowed this method of calculating drug quan-

tities, and he urges us to do the same. *See, e.g., United States v. Butler*, 41 F.3d 1435, 1447 (11th Cir.1995); *United States v. Zimmer*, 14 F.3d 286, 289–90 (6th Cir.1994); *United States v. Sepulveda*, 15 F.3d 1161, 1198–99 (1st Cir.1993); *United States v. Shonubi*, 998 F.2d 84, 89–90 (2d Cir.1993); *United States v. Garcia*, 994 F.2d 1499, 1508–09 (10th Cir.1993); *United States v. Hewitt*, 942 F.2d 1270, 1274 (8th Cir.1991). However, our review of these cases from sister circuits reveals only the requirement that the information inserted into such an equation be reliable, not disapproval of this sort of multiplication generally. We too require reliable data. We have remanded cases for resentencing when the numbers used in such calculations did not bear indicia of reliability. *See, e.g., Acosta*, 85 F.3d at 282; *United States v. Howard*, 80 F.3d 1194, 1205 (7th Cir.1996). We see no circuit split, and we decline to disavow this method generally.

### iv.

Finally, Burke complains generally that the district court relied on hearsay in making its relevant conduct determinations. For example, Conway's statement and testimony did not reflect personal knowledge of all of Burke's travels and purchases. Rather, most of Conway's information came from a co-conspirator who was unavailable to testify or give a statement. Also, McRoy's testimony regarding the amount of LSD Burke dealt did not come completely from personal knowledge. McRoy gathered quite a bit of information from his cousin, who was Burke's LSD source. Burke argues that this information does not bear the hallmarks of reliability that we require in sentencing determinations.

Burke correctly notes that defendants must be sentenced based on reliable information. However, "the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a) (1995); *United States v. Beler*, 20 F.3d 1428, 1432 (7th Cir.1994) (District courts are "free to consider a wide range of information, in-

cluding hearsay evidence, that may have been inadmissible at the defendant's trial.").

■ Here, the district court fully addressed any problems of reliability that stem from hearsay by finding the witnesses credible and their testimony corroborated by other evidence. After two partial days of sentencing hearings, the court decided to hear from the key witnesses in person. Conway and McRoy appeared and testified. After hearing their testimony, the court found Conway to be "credible" and McRoy to be "very credible." We will not disturb credibility determinations, which are the unique province of the district court. "It is the proper role of the district court to make credibility determinations, and those findings must receive special deference." *United States v. Fox*, 137 F.3d 527, 531 (7th Cir.1998) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–75, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). Beyond finding the witnesses credible, the district court found their hearsay testimony sufficiently corroborated by other witnesses' testimony, statements, and the PSR. We will not disturb the district court's finding here.

### 2. Factual Objections

#### i.

Burke complains that the district court erred in calculating the amount of methamphetamine and marijuana he dealt. The court made that calculation by multiplying the number of trips to Arizona Burke made (sixteen) by the amount of marijuana and methamphetamine he brought back to Illinois each time (three pounds of marijuana and one ounce of methamphetamine). Burke does not dispute the amounts he brought back each time. Rather, he contests the court's finding that he traveled to Arizona sixteen times.

The PSR indicates that he went to Arizona sixteen times, but Burke objected to the PSR on this point. He and the Government failed to resolve his objection before the sentencing hearing. At the hearing, Burke testified that he went to Arizona only four times. He argues that Conway's testimony also supports his position. While the evidence of Burke's travel frequency is not overwhelming, we cannot say the district court clearly erred on this point.

■ Conway's statement indicated that Burke traveled to Phoenix every month or two from November 1993 to July or August 1996, making 16–32 trips. McRoy's statement says that he and Burke traveled to Arizona on numerous occasions. Based on those statements and other evidence gathered by the Probation Officer during his investigation, he concluded in the PSR that Burke made at least sixteen trips to Arizona.

Burke asserts that at the sentencing hearing, Conway denied that Burke traveled to Arizona sixteen times. On direct examination, Conway testified that he sold methamphetamine and marijuana to a dealer at least fourteen times, learning from that dealer that the drugs were for Burke and that Burke was in Phoenix. Burke asserts that on cross-examination, Conway contradicted the PSR:

Q: Did you ever tell agents of the DEA that you believed Dale Burke was coming to Arizona to purchase on a monthly or bi-monthly basis?

. . . .

[AUSA]: It's the proffer?

[Burke's attorney]: Yes.

Q: (by [Burke's attorney]) With Agent Chapman, Brian Chapman?

A: Yes, sir.

. . . .

Q: (by [Burke's attorney]) Did you tell the agents he was coming down there on a monthly or bi-monthly basis?

A: I believe what I said, he was purchasing on a monthly or bi-monthly basis whether it was through the mail or in person.

Q: Okay. So if somebody represented that you said Dale was coming down there every month or every other month during that time frame, then they misunderstood what you said?

[AUSA]: Objection.

The Court: Sustained. You asked the question in an impeachment form. He answered the question. Next question.

Q: (by [Burke's attorney]) So to your knowledge, did Dale Burke come down to Arizona, Phoenix, Arizona, on a monthly or bi-monthly basis?

[AUSA]: Could he define bi-monthly?

[Burke's attorney]: Every other month. The Witness: Coming to Arizona?

Q: (by [Burke's attorney]) Yes, to your knowledge, what you know by yourself without somebody telling you, was Dale Burke coming down there on a monthly or bi-monthly basis?

A: I'm not sure when he was coming down there. All I would know, I would hear he was coming down there. Other people would tell me he was there that were friends of Scott and mine. I may not have actually seen him, but Scott told me the money was there. The guy wanted to purchase it. Scott would show up with the money.

Contrary to Burke's contentions, this convoluted cross-examination reveals nothing helpful. Conway's written statement indicated 16–32 trips to Arizona. His direct testimony indicated at least fourteen. Conway did not disavow or directly contradict his earlier statement. We cannot say that the district court clearly erred in finding, consistent with the PSR, that Burke made sixteen trips to Arizona.

ii.

Burke highlights what he believes is another contradiction. In his statement, McRoy submitted that Burke dealt 5200 dosage units of LSD. The PSR reflected this fact, elaborating that Burke had a connection with McRoy's cousin, buying 100 dosage units of LSD every week for a year for a total of 5200 units. At the sentencing hearing, McRoy testified that Burke got 75–100 dosage units from his cousin for six months to a year (giving a range of 1950 to 5200 dosage units). When the AUSA asked McRoy whether 1700 dosage units was a reasonable estimate, McRoy answered that it was, but that Burke might have dealt more. Burke did not offer any evidence besides his own testimony to counter these amounts. After hearing all the testimony and reviewing the exhibits, the district court adopted the PSR.

■ Burke correctly points out that the district court did not specifically address this point. However, "[e]ven when the district court has failed to make specific findings ... we have affirmed where 'the record adequately supports such a determination.'" *McKinney*, 98 F.3d at 982 (quoting *Carson*, 9 F.3d at 585). Here, the record does adequately support a conclusion that Burke dealt 5200 dosage units of LSD. Both McRoy's statement and the PSR estimated Burke's dealings at that level. McRoy's testimony, while hardly precise, did not contradict his earlier statement or the PSR. McRoy in effect testified to a range between 1700 and 5200 dosage units of LSD. "Thus, when the court stated that based on the presentence report and the evidence adduced at the sentencing hearing it was overruling [the defendant's] objection, it did so in a context which informs this court that it was adopting as its own the factual findings found in both." *Id.* at 982. We cannot say, after reviewing McRoy's testimony, his statement, and the PSR, that a finding of 5200 dosage units is clearly erroneous.

■ We are particularly disinclined to disturb Burke's sentence even if we do harbor some doubt that he actually dealt 5200 dosage units of LSD. Even if the district court had found that he dealt only 1700 dosage units of LSD, his sentence would be the same. 5200 units of LSD converts to 208 kilograms of marijuana equivalent, and 1700 dosage units of LSD converts to 68 kilograms of marijuana. Finding that Burke dealt only 1700 dosage units would still leave him in the marijuana equivalent range of 400 to 700 kilograms—his sentence would not change.

B. Binford *Issue*

Burke received two criminal history points because at the time of the offense of conviction, he was serving another sentence. On March 7, 1996, Burke pled guilty to driving without a license and driving with a suspended license in Illinois state court. He was sentenced to twelve months' court supervision, which he successfully completed on March 10, 1997. He was arrested on these federal drug charges on November 12, 1996,

during the period of Illinois court supervision.

The district court added two criminal history points because Burke's federal offense occurred while he was under Illinois court supervision. The Guidelines instruct the district court to "[a]dd 2 points if the defendant committed the instant offense while under any criminal justice sentence, including probation." U.S.S.G. § 4A1.1(d). The district court counted the offenses of driving without a license and driving with a suspended license because "[s]entences for misdemeanor and petty offenses are counted, except as follows: (1) Sentences for the following prior offenses and offenses similar to them, by whatever name they are known, are counted only if (A) the sentence was a term of probation of at least one year or a term of imprisonment of at least thirty days...." U.S.S.G. § 4A1.2(c). "Driving without a license or with a revoked or suspended license" is one of the misdemeanor and petty offenses listed. U.S.S.G. § 4A1.2(c)(1).

Burke argues that court supervision is not a "criminal justice sentence" because in Illinois the successful completion of court supervision does not result in a conviction on the record. Instead, the case is dismissed entirely. We addressed this issue in *United States v. Binford*, 108 F.3d 723 (7th Cir. 1997), *cert. denied*, —— U.S. ——, 117 S.Ct. 2530, 138 L.Ed.2d 1029 (1997). In *Binford*, the defendant challenged the district court's decision to assign him two criminal history points for committing the instant offense while on court supervision in Illinois for illegal transportation of alcohol by a driver. *See id.* at 725. Binford first argued that illegal transportation of alcohol by a driver was similar to an offense listed in U.S.S.G. § 4A1.2(c), but we rejected that argument as "dubious." *Id.* at 726. Rather than analyzing his novel argument, we advanced to the next inquiry under § 4A1.2(c), whether Binford was sentenced to a term of probation of at least one year. *See id.* at 727. We held that he was. "[S]upervision is the functional equivalent of conditional discharge, which we previously have held to be the functional equivalent of probation. The bottom line is that probation, conditional discharge and supervision all allow a convicted defendant to stay out of prison so long as he stays out of trouble." *Id.* We noted that the only difference between court supervision and unsupervised probation is that "charges against a convicted defendant on supervision may ultimately be dismissed. This is of no consequence for purposes of § 4A1.2(c)(1)." *Id.* at 727–28. Thus, we held that court supervision is a criminal justice sentence and the district court properly added two criminal history points.

Burke attacks *Binford* in two ways. First, he argues that our discussion of whether court supervision is the same as probation for purposes of § 4A1.1(d) is dicta and therefore not binding. According to Burke, the discussion is dicta because we decided in the previous paragraph that the defendant's offense was not similar to any listed in § 4A1.2(c)(1), thereby making his offense countable in criminal history regardless of whether court supervision is a kind of probation. We disagree. We did not decide that the defendant's sentence was dissimilar to any listed offense. We merely assumed it. We found it "unnecessary to analyze the issue of similarity any further." *Binford*, 108 F.3d at 726. We went on to "[a]ssum[e] *arguendo* that Binford's misdemeanor is 'similar to' one of the offenses listed." *Id.* We decided *Binford* on precisely the ground Burke faces now.

Burke also argues that we misconstrued the sentencing guidelines in *Binford* by regarding court supervision as a conviction under Illinois law. He cites numerous Illinois cases and statutes showing that upon the successful completion of court supervision, the charges are dropped and there is no longer a conviction on the defendant's record. This is of no moment to our analysis of the Guidelines. The Guidelines are federal law. They do not rely on state definitions or labels. We have previously analyzed the import of having a case dismissed after successful completion of court supervision. We found that when a defendant successfully completes court supervision, his conviction is "not set aside because of his innocence. His conviction [i]s set aside under Illinois law for purposes of removing the stigma associated

with a criminal conviction and to restore his civil rights." *United States v. Stowe*, 989 F.2d 261, 263 (7th Cir.1993). To rephrase, the defendant is no less guilty of the offense after completing his court supervision than he was when he was found guilty, whether or not Illinois still considers him a misdemeanant.

Furthermore, the Guidelines ask whether at the time of the instant offense the defendant was serving a criminal justice sentence. *See* U.S.S.G. § 4A1.1(d). Whether that criminal case against the defendant may later be dismissed has no effect on the answer to that question. The Guidelines seek to enhance the punishment of defendants who commit crimes while they are specifically under court directive to keep their noses clean. Burke was under such a directive. The district court properly assigned him two criminal history points under § 4A1.1(d).

For the foregoing reasons we AFFIRM Burke's sentence.