# In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-1406

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JOSEPH V. SYKES,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 CR 647-1—**John W. Darrah**, *Judge.*

_____

ARGUED OCTOBER 1, 2003—DECIDED FEBRUARY 4, 2004

_____


Before KANNE, ROVNER, and EVANS, *Circuit Judges.*

KANNE, *Circuit Judge.* Between November 1998 and December 2001, Joseph Sykes manufactured counterfeit checks on his home computer and used them to defraud approximately 20 different banks and investment companies. Before being caught he caused over $1 million of actual loss to his victims. In August 2002 Sykes pleaded guilty to one count of bank fraud, 18 U.S.C. § 1344. The court sentenced him to 100 months' imprisonment and 5 years' supervised release and ordered him to pay over $1 million in restitution. He argues that the court erred in setting his offense level and calculating his criminal history points. We affirm.

## I. History

Before this case, 32-year-old Sykes had already accumulated at least nine state convictions involving bad checks and one federal conviction for bank fraud. Sykes's current bank fraud scheme was quite straightforward. First, he made counterfeit checks on his home computer, replicating real checks but substituting fictitious account numbers. Then he deposited some of these checks along with real ones written against closed or overdrawn accounts into new accounts that he opened in his own name or one of his seven aliases. Sykes usually used each new account just long enough to deposit a few checks over the course of several days and then withdraw what he could before the bank discovered the fraud. Sykes also generated other counterfeit checks with real account numbers and used them to initiate fraudulent wire transfers. He would tender a counterfeit check at a bank where he already had an existing account, but instead of making a deposit, he would use it as "proof" of an account at the drawee bank and initiate a wire transfer out of that account and into one of his own accounts. Again he was able to withdraw some funds before the banks detected the fraud and reversed the wire transfers.

Sykes pleaded guilty to one count of bank fraud and proceeded to sentencing. He made several objections to the probation officer's and government's sentencing recommendation, including one to his offense level and one to his criminal history category. His offense level was set at 24, including 15 points for intending to cause more than $10 million in loss. *See* U.S.S.G. § 2F1.1 (1998) (now incorporated into U.S.S.G. § 2B1.1). He was assessed 16 criminal history points, which placed him in criminal history category VI. *See* U.S.S.G. Ch. 5, Pt. A, Sentencing Table. The court gave him the minimum term of imprisonment possible for his offense level and criminal history category, 100 months.

## II.  Analysis

Sykes argues first that the district court failed to explain its conclusion that he intended to inflict over $10 million of loss. He says that the district court should have explained why it was accepting the government's calculation of intended loss instead of the figures he proposed. He contends that the district court's explanation for its conclusion is so deficient that he "cannot challenge, and this court cannot evaluate, the district court's conclusion until the district court has completed its job." Sykes's argument is very narrowly focused on the district court's reasoning and not on its ultimate calculation of loss, though Sykes says that he "believes that if the district court is forced to articulate its rationale, it will come to a different conclusion."

Sykes's argument is without merit. Federal Rule of Criminal Procedure 32(i)(3) requires a district court to rule on all controverted matters that will affect sentencing. *See* Fed. R. Crim. P. 32(i)(3) (formerly Rule 32(b)(6)(d)); *see United States v. Burke*, 148 F.3d 832, 835 (7th Cir. 1998). This requirement ensures that the court addresses all of the defendant's objections and provides a record of how the objections were resolved for later reference. *United States v. Cureton*, 89 F.3d 469, 473 (7th Cir. 1996). But Rule 32 does not impose an onerous burden. The district court can often satisfy the rule by adopting the proposed findings in the presentence report (PSR), even as to contested facts, *Burke*, 148 F.3d at 836, so long as the PSR articulates a sufficiently clear basis for the sentence, *see United States v. Schaefer*, 291 F.3d 932, 938-39 (7th Cir. 2002), and the reviewing court can be sure that "the district court made a decision of design rather than of convenience," *Burke*, 148 F.3d at 836. The district court did not set Sykes's sentence simply by adopting the PSR, but these cases demonstrate the court's minimal burden.

In this case the controverted matter was the amount of loss, and the court clearly resolved the controversy and then provided a basis for its ruling. Sykes's attorney argued that his client intended to steal only as much as necessary to satisfy his personal and business debts. The government countered that Sykes intended to steal the total amount of the fraudulent deposits and wire transfers. As evidence of its calculation, the government offered a detailed list of all the fraudulent deposits and wire transfers totaling approximately $13 million. The government also described a conversation between Sykes and an investigator from Merrill Lynch during which Sykes explained that there was a window of opportunity for him to steal fraudulently transferred funds before the fraud was detected (suggesting that Sykes could have stolen all of the money in that window of opportunity). When the district court settled on the government's theory, the court cited the relevant case law, explained that it agreed with the government's analysis of the facts (which tracked the analysis articulated in the PSR) and then explained that it was rejecting Sykes's calculations because it believed that Sykes intended to steal the total amount of money he deposited into the accounts. The court was especially persuaded by Sykes's statement to the Merrill Lynch investigator. The district court's explanation is sufficient to serve the purposes of Rule 32. And Sykes's contention that the district court's analysis is too inadequate to facilitate his appeal is disingenuous; just as he understood the PSR analysis well enough to urge its rejection in a 22-page memorandum to the district court, he could also understand equally well the district court's loss calculation, which matched the total offered by the government and the probation officer.

Perhaps the reason Sykes attacks only the court's reasoning and then professes his inability to attack the ultimate loss calculation is that the law would be against him if he

were to attack to the loss calculation directly. We would review the court's factual conclusion about Sykes's intended loss only for clear error. *United States v. Kipta*, 212 F.3d 1049, 1051 (7th Cir. 2000). There is ample case law that in a bank fraud case the total amount of fraudulent deposits is an acceptable calculation of intended loss. *Id.* at 1052 (affirming district court's conclusion that defendant intended to defraud bank out of total amount of checks drawn on account with insufficient funds); *United States v. Yusufu*, 63 F.3d 505, 513-14 (7th Cir. 1995) (affirming district court's calculation of intended loss as inflated face amount of money orders and checks that defendant had altered before depositing them); *United States v. Strozier*, 981 F.2d 281, 282, 284-85 (7th Cir. 1992) (affirming district court's calculation of intended loss based on total amount of worthless checks deposited into an account). Certainly the district court was not required to accept as true Sykes's own representation—made through his lawyer and supported with only documents and charts rather than with sworn testimony—about the portion of the worthless deposits he hoped to access. *Cf. Campania Mgmt. Co. v. Rooks, Pitts, & Poust*, 290 F.3d 843, 853 (7th Cir. 2002) (statements by attorneys are not evidence).

Sykes's second argument is that the court incorrectly counted his criminal history points. The district court assessed 16, and he contends that he should have received only 7 because some of his prior sentences were imposed in "related cases," U.S.S.G. § 4A1.2(a)(2), and should thus be treated as one sentence. Sykes's point total of 16 put him in criminal history category VI. A point total of 13 is sufficient to support that criminal history category. Sykes does not challenge the two points he received for committing the current crime within two years of being released from prison. He also leaves unchallenged the three points he received for his prior federal conviction in Florida for bank

fraud, except to argue that several other sentences should be grouped with the bank fraud. Five points, then, are undisputed.

Sykes contends that his state conviction for grand theft auto (two points) was related to his prior federal bank fraud conviction in Florida because both offenses were part of the same scheme or plan. We have said that offenses are part of the same scheme or plan only if they were "jointly planned" or if "one crime entails the commission of the other." *United States v. Brown*, 209 F.3d 1020, 1023 (7th Cir. 2000). And defendants have the burden to show relatedness because they are in the best position to know whether they jointly planned two crimes and whether one entailed the commission of the other. *Id.* Sykes argued to the district court that the two crimes were related because the only reason he committed the bank fraud was to "amass[ ] as much money as possible . . . so that he could then write checks to buy various products and pay off his creditors." The district court concluded that Sykes had not met his burden, a conclusion we must give due deference. *See Buford v. United States*, 532 U.S. 59, 66 (2001). Sykes reasserts on appeal that the two crimes were related because he planned to purchase "various products" when he initiated the bank fraud, but that is different from saying that he planned to pass a bad check for a car at the same time he planned the bank fraud. He also does not explain how his plan to pass a bad check for a car would entail perpetrating a complex bank fraud scheme. The district court was correct to assign the three points for the previous bank fraud conviction and two more for the grand theft. That brings the point total to seven.

Sykes presents a similar argument that three state crimes he committed in 1994 were related, specifically, two convictions for obtaining property in return for worthless checks (two points each) and one for passing a worthless check (one point). All three checks apparently were written

out of the same First Union account but on different days and to different payees. Sykes argued to the district court that the three convictions were part of a common scheme because "[a]s with the 1991 federal case, [he] wrote these checks to amass false balances in order to obtain goods fraudulently." Once again, there is no evidence that he formed the intent to write these separate bad checks all at the same time or that writing one entailed writing the others. They were written on different days to different people and do not appear to be written to "amass false balances" at all but instead to obtain goods or services. The simple fact that Sykes repeatedly used the same modus operandi does not make the crimes related. *Brown*, 209 F.3d at 1024. These five points move the total to 12.

Next, Sykes argues that his Florida conviction for unlawful possession of a driver's license is related to his prior federal bank fraud conviction. His attorney argued to the district court (without a supporting affidavit from Sykes) that the two crimes were part of a common scheme because "Mr. Sykes used false identification to open bank accounts in furtherance of his scheme to defraud." Sykes appears to be arguing that the commission of the bank fraud entailed the commission of the license offense. The district court commented that the conviction for false use of a driver's license "arguably supports an inference that the driver's license was used in the furtherance of or in connection with one of these other offenses . . . in facilitating the commission of these other fraudulent security offenses," but ultimately concluded that Sykes had not met his burden to prove relatedness. Giving due deference to the district court, we find no error in its determination. That brings the point total to 13, which supports the current criminal history category of VI. Sykes's arguments about the remaining three points could not alter his criminal history category.

### III. Conclusion

Accordingly, we AFFIRM the judgment of the district court.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*