# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 05-1548 & 05-1549

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOE DE LA CRUZ and EDWARDO MALDONADO,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 03 CR 91—**Robert L. Miller, Jr.**, *Chief Judge.*

ARGUED MAY 31, 2006—DECIDED NOVEMBER 29, 2006

Before KANNE, EVANS, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* Defendants Joe De La Cruz and Edwardo Maldonado were each convicted on a single count of misapplying public funds in violation of 18 U.S.C. § 666(a)(1)(A). On appeal, the defendants argue that they could not have misapplied funds in violation of § 666(a)(1)(A) because the expenditures in question were properly approved by the city government. Defendants also argue that an evidentiary ruling constitutes reversible error and that their sentences are the result of clear error. We disagree and affirm the convictions and sentences.

## I. HISTORY

De La Cruz and Maldonado were both public officials in the city of East Chicago, Indiana. De La Cruz was a member of the City Council. Maldonado was the City Controller, which made him the chief fiscal officer for the City. His signature appeared on all checks paid with City money. Maldonado was also a member of the Board of Works, which was responsible for approving all public works projects.

In 1998, the Board of Works began soliciting bids for specific work to be done on the City's sidewalks. Under Indiana law, any project estimated to cost more than $75,000 must be publicly bid. A flat bid of $454,155 was received for the project from a company called Reith-Riley in June. Given the amount of work solicited, that bid came out to $5.08 per foot. No action was taken on this bid. Instead, the City Engineer at that time ordered the work to be done on a piecemeal basis, in amounts lower than $75,000.

### A. *The 1999 Sidewalk Program*

In February of 1999, Maldonado attended a meeting of the Board of Works along with a new City Engineer, Pedro Porras.[1] Prior to that meeting, Maldonado asked Porras to ask the Board to advertise bids for work on public sidewalks. Porras obliged, even though he had no such plans before the meeting. The Board approved, and even hired an engineering consultant to oversee the prospective sidewalk plan. But the plan never got off the ground, and in March of 1999 it was postponed indefinitely.

---

[1] Porras was indicted along with De La Cruz and Maldonado, but pled guilty prior to trial.

Despite the absence of an approved plan, sidewalks were being poured in East Chicago. Several contractors were at work, despite the fact that many of them had never worked on sidewalks before. The contractors were operating without the formal approval of the Board of Works and without complying with the procedural requirements necessary to begin a city project. The orders to pour concrete came from a number of sources, including De La Cruz and Frank Kollintzas, president of the City Council.[2]

The work was not limited to sidewalks. Contractors also poured new driveways, patios, basketball courts, boat pads, and swimming pools—all on private property. A number of private businesses had their parking lots redone. Other residents had their trees trimmed for free.

All of this work was done against the backdrop of a primary election scheduled for May 4, 1999. Kollintzas, De La Cruz, and the Mayor of East Chicago all faced primary battles. Kollintzas would knock on doors in his district, introduce himself as a councilman and then offer free concrete. Residents openly supporting Kollintzas, the Mayor, and their political allies were provided free services, while those supporting the political opposition were refused. Millions of dollars worth of work was performed in a ten-week period between March and May of 1999. In the days leading up to the election, contractors were working 10 to 15 hours a day, 6 to 7 days a week.

Despite the fact that he was City Engineer, Porras was first informed about the concrete work through citizen complaints and from Kollintzas. Kollintzas directed Porras to provide concrete work to specific contractors. Porras did so only after conferring with Maldonado and being

---

[2] Kollintzas went to trial along with De La Cruz and Maldonado, but fled the country after his conviction. He was sentenced in absentia to 136 months' imprisonment.

assured by Maldonado that the City would handle all the bills. From March to May of 1999, Maldonado's office issued millions of dollars worth of checks to pay for the work, including work done on private property.

De La Cruz frequently authorized and supervised concrete work. He, in fact, had work done at his home, including a driveway, steps, and a walkway. One East Chicago resident, who had campaign signs up for the political opposition, witnessed work in her neighbor's yard and asked De La Cruz if she too would receive new concrete. De La Cruz told her she had the wrong sign up.

After the election, the City was faced with the daunting prospect of paying all the contractors and finishing up the work. On the day of the election, the City's bank account was overdrawn by approximately three million dollars. By the middle of May, that amount increased another two million dollars, at which point the bank began dishonoring all City checks, including payroll. In the end, the City spent close to 24 million dollars in the weeks leading up to the election pouring concrete and trimming trees.

### B. Ratification

The City attempted to clean up the mess by hiring an engineering consultant and a lawyer. The consultant performed an audit to determine what work had been done, what remained, and who needed to be paid. The lawyer advised the City to do what it heretofore had not—approve of the work through proper legal channels. Ordinances were passed raising millions of dollars necessary to keep the city operating. These ordinances purported to have the City Council appropriate money for the already completed work. The Board of Works then met in June of 1999 to accept the bid Reith-Riley had made nearly a year earlier. The Board accepted the bid in its $5.08 per foot form as the unit price

to be paid for all outstanding claims. The City then began to settle outstanding claims with each of the contractors, requiring them to sign backdated work agreements. These agreements included paying for work done on private property. Maldonado was involved in these negotiations, and he signed the backdated agreements on behalf of the Board of Works.

### C.  The State Audit

The City's problems were far from over. Each year, the State of Indiana audits the financial statements of municipalities, including those of East Chicago. The State's 2000 audit report for East Chicago determined that the Board of Works violated state law by approving "nonpublic concrete work." The auditors also requested, in accordance with state law, that each member of the Board of Works reimburse the City for all money spent in violation of law.

The City responded with its own legal opinion, which was required to be included in the State's official audit report. The opinion, in short, argued that the City was in the somewhat unique position of being in control of a private nonpublic trust fund that could be used for private purposes. The source of this trust fund was a local casino. That casino generated five revenue streams for the City. Two of those revenue streams were required and authorized by statute. Two other revenue streams benefited nonprofit corporations outside of the City's control. A final, fifth fund, apparently unique to the City of East Chicago, was created as a result of an agreement between the casino and East Chicago's Mayor. This revenue stream ran through an expendable trust and then into a sub-fund, Fund 246, of the City's general fund. According to the City's legal opinion, Fund 246 "could be used for any purpose authorized [by the trust], including paying for nonpublic concrete work that improved property values within the

City." The state auditors, apparently unconvinced, did not change their report.

### D. Trial and Sentencing

At trial, the defendants attempted to admit into evidence the State's audit report and the City's accompanying legal opinion. The government objected, arguing that the City's response to the audit report was impermissible hearsay. While Chief Judge Miller agreed with the defendants that under Indiana law, the audit report and the City's response were a single document, he still thought it proper to treat the two separately while addressing the hearsay objection. Judge Miller was willing to allow admission of the audit report as a public record under Federal Rule of Evidence 803(8), but ruled that the City's response was impermissible hearsay.

The defendants were tried on a number of charges, but were only convicted on one count each of misapplication of public funds. They were acquitted on all other counts. These convictions occurred between the Supreme Court's decisions in *Blakely v. Washington*, 542 U.S. 296 (2004), and *United States v. Booker*, 543 U.S. 220 (2005). Attempting to deal with the uncertainty created by *Blakely*, Judge Miller submitted the question of loss amount to the jury, which came up with amounts of between $800,000 and $1,500,000 for Maldonado, and between $120,000 and $200,000 for De La Cruz.

The defendants were not sentenced, however, until after *Booker*, at which point Judge Miller decided he was not bound by the jury's loss amount finding.[3] Judge Miller made his own finding, applicable to both defendants, of 23.97

---

[3] The defendants have not appealed Judge Miller's ruling that the jury's loss determination was not binding.

million dollars. He agreed with the defendants that the loss amount should be offset by any value given to the City, but nevertheless determined that the City of East Chicago had received no benefit whatsoever by having its funds misapplied to pay for the work performed in the Spring of 1999. The loss amount, along with other enhancements, resulted in prison sentences for Maldonado and De La Cruz of 97 and 72 months, respectively.

## II. ANALYSIS

The defendants' main argument on appeal is that the City's "ratification" of the work makes it legally impossible for them to be guilty of misapplication of public funds. Defendants also take aim at Judge Miller's decision to allow the State's 2000 audit report but not the City's accompanying legal opinion. Finally, the defendants attack their sentences, arguing that the ratification makes the loss amount zero, and, alternatively, that they deserve some credit for the benefit they believe the City received from the concrete and other work performed in March and May of 1999.

The purported ratification consists of the actions the City Council and Board of Works took at the behest of their lawyer, including the after-the-fact authorization of the work and the acceptance of the nearly year old Reith-Riley bid. In support, the defendants delve deeply into Indiana law, explaining in detail how state law allows a city to "ratify any action of the unit . . . if that action could have been approved in advance." IND. CODE ANN. § 36-1-4-16 (West 2006).

We have serious doubts that the defendants' attempt at ratification can meet the state law's requirement that "[r]atification of an action . . . must be made by the same procedure that would have been required for approval of the

action in advance." *Id.* But we need not decide any questions of Indiana municipality law. For our purposes, we can assume the Board of Works and the City Council properly ratified, after the fact, all of the concrete work in question. We nevertheless reject the defendants' premise that a municipality's ratification, or authorization, of an expenditure is a complete defense to a federal criminal prosecution for misapplication of public funds under 18 U.S.C. § 666(a)(1)(A).

The defendants candidly admit they can find no criminal case applying their theory of defense. Our precedent has considered it under similar circumstances and rejected it. In *United States v. Bailey*, 859 F.2d 1265 (7th Cir. 1988), the defendant was convicted of willfully misapplying the funds of a savings and loan in violation of 18 U.S.C. § 656. On appeal, the defendant argued that the district court erred by refusing to instruct the jury that the board's consent to the expenditures in question was a complete defense to the misapplication charges. *Id.* at 1279. We affirmed, explaining that the Supreme Court has made clear that so long as the proper intent exists, a bank board's authorization does not bar criminal prosecution for misapplication. *Id.* (citing *Evans v. United States*, 153 U.S. 584, 593 (1893)). We think *Bailey*'s reasoning applies equally to prosecutions under § 666.

Authorization, or ratification, from those with authority can be an important evidentiary factor in favor of the defense, militating against a finding of intentional misapplication. *Id.* (citations omitted); *see also United States v. Castro*, 887 F.2d 988, 995 (9th Cir. 1989) (quoting *United States v. Unruh*, 855 F.2d 1363, 1368 (9th Cir. 1987) ("Evidence of a bank's consent is . . . treated as 'evidentiary matters [sic] that may be considered as part of the defense that there was either no willful misapplication or no intent to injure the bank.'")). But after-the-fact ratification does not function as a complete defense to prosecution when

criminal intent is proven, and this case is a good illustration of why. Many of those purportedly ratifying the work were later indicted. These officials attempted to immunize themselves from federal prosecution by simply stamping their criminal misapplication of funds as approved. Whether the defendants were acting with the intent to misapply funds, or for proper purposes, is a question for the jury. The jury found that the defendants had criminal intent to misapply funds. On review, "viewing the evidence in the light most favorable to the prosecution," we find that a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Haddad*, 462 F.3d 783, 791 (7th Cir. 2006) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). There was substantial evidence presented to the jury that the defendants intended to provide the sidewalk and other benefits solely for their own personal and political advantage. There may be a case where the consent or authorization of those with authority, combined with a dearth of evidence supporting a criminal intent, results in insufficient evidence to find a defendant guilty under § 666(a)(1)(A). *See Bailey*, 859 F.2d at 1279. This is not that case. There was sufficient evidence for the jury to conclude that the defendants intentionally misapplied funds.

The defendants also argue that Judge Miller abused his discretion in refusing to allow into evidence the City's legal opinion, which accompanies the State's 2000 audit report. Evidentiary rulings are reviewed for an abuse of discretion. *United States v. White*, 443 F.3d 582, 591 (7th Cir 2006). We give "special deference to the evidentiary rulings of the trial court." *Id.* (quoting *United States v. Briscoe*, 896 F.2d 1476, 1490 (7th Cir 1990)).

According to the defendants, Judge Miller's ruling allowing the audit report as a public document requires the admission of the City's legal opinion, which, under Indiana law, is considered to be part of the report. We disagree. The

public records exception is justified on "the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record." Fed. R. Evid. Adv. Cmmte. Note to Rule 803(8) (citing *Wong Wing Foo v. McGrath*, 196 F.2d 120 (9th Cir. 1952); *Chesapeake & Delaware Canal Co. v. United States*, 250 U.S. 123 (1919)). Accordingly, the language of the rule focuses on reports of the activities *of the office*, and on observations and investigations *made under the authority of law*. The City's response to the audit does not have the indicia of reliability supporting the public records exception. Judge Miller did not abuse his discretion by ruling that it was not a public record, despite its inclusion in one.

Finally, the defendants attack their sentences, positing two alternative reasons why they think Judge Miller committed clear error in calculating a loss amount of 23.97 million dollars. *United States v. Sykes*, 357 F.3d 672, 675 (7th Cir. 2004). "We find clear error only when we are 'left with the definite and firm conviction that a mistake has been made.'" *United States v. Vivit*, 214 F.3d 908, 914 (7th Cir. 2000) (quoting *United States v. Strache*, 202 F.3d 980, 984-85 (7th Cir. 2000)). The defendants do not dispute that a total of 23.97 million was paid out for the work done between March and May of 1999. The defendants first argue that because the work was ratified by the City Council and Board of Works, the loss amount must be zero. Second, the defendants argue that Judge Miller clearly erred by finding that the City received no benefit from the concrete work.

We can easily dispatch of the ratification argument. As explained above, ratification or authorization does not ipso facto cure a misapplication of public funds. The jury found a misapplication of funds, and, therefore, the City of East Chicago suffered a loss due to those improper expenditures. The defendants nevertheless analogize this case to one

where A tells B of his plans to purchase a lawnmower. Then B, without permission, forges a check in A's name to purchase and deliver a lawnmower to A. A gets the lawnmower he desired and presumably at the right price. The fatal flaw in defendants' analogy, however, is in comparing the City of East Chicago to A. The City did not ask for or want the sidewalks it received—it got the sidewalks as a result of a misapplication of funds. The error in the defendants' reasoning seems to be the flawed logic—logic which likely got the defendants in this mess—that they, the elected officials of East Chicago, *are* the City. But the City of East Chicago is comprised of its citizens, and these citizens are the ones who were harmed when the defendants intentionally misapplied millions of dollars of public funds.

The defendants also argue that Judge Miller clearly erred by finding the City received no value from the misapplication. While the judge agreed that an offset would be appropriate if value had been created from the misapplication, he decided that all of the work, including the new sidewalks, provided no value to the City. The defendants argue that it defies common sense to find that the City received no value when it is undisputed that most of the money was spent on public sidewalks.

We easily reject the argument, to the extent the defendants make it, that any work on private property should be considered a credit. The individuals owning the private property may have received a benefit, but the citizens of East Chicago as a whole clearly gained nothing. The public sidewalks are more difficult. There is some force to the defendants' protestations that the City obviously gained some value from the new sidewalks poured there, but this reasoning implies that value can be thrust on unwilling participants. The core of the misapplication charge is that the money spent could have been spent somewhere else. We have previously held that part of the value to be determined

in the calculation of loss is the ability of the people through their governmental institution to make an informed decision. *See United States v. Frost*, 281 F.3d 654, 659-60 (7th Cir. 2002). We do not know if the citizens of East Chicago would have wanted the 23.97 million spent on concrete and other work projects because their elected officials failed to follow the proper procedure for reaching that decision before spending the money. A sidewalk might have some objective value, but that does not mean the citizens of East Chicago value it more than increased police protection or other improved city services. The value of losing this decision-making ability offsets any gain in sidewalks actually received.

Our review of the evidence shows that in 1998 the City proposed about half a million dollars of work on sidewalks, which was completed piecemeal so as to avoid public bidding requirements. In 1999, the Board of Works discussed more sidewalk work, but never followed through on it. The best we can tell from this is that there may have been an argument that the City received close to half a million dollars in value that it would have spent on sidewalks in the absence of defendants' crimes. But the defendants do not present us with this argument, nor do we believe it would have required the sentencing judge to assess a credit. Gross amounts of public monies were misspent by the defendants on sidewalks and other services, and our review of the evidence does not lead us to the conclusion that Chief Judge Miller clearly erred by finding no value was created by these crimes.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the defendants' sentences and convictions.

A true Copy:

   Teste:

                         _____
                         *Clerk of the United States Court of*
                         *Appeals for the Seventh Circuit*